```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X
IN RE FLAG TELECOM HOLDINGS, LTD.       :
SECURITIES LITIGATION                              02 Civ. 3400 (WCC)
                                        :
THIS DOCUMENT RELATES TO:                             OPINION
                                        :             AND ORDER
ALL ACTIONS
- - - - - - - - - - - - - - - - - - - -X
```

**A P P E A R A N C E S :**

|  |  |
|---|---|
|  | MILBERG WEISS BERSHAD & SCHULMAN, LLP |
|  | **Lead Counsel for Plaintiff and the Class** |
|  | One Pennsylvania Plaza |
|  | New York, New York 10119-0165 |
| BRAD N. FRIEDMAN, ESQ. |  |
| RACHEL S. FLEISHMAN, ESQ. |  |
|     Of Counsel |  |
|  | MILBANK, TWEED, HADLEY & McCLOY LLP |
|  | **Attorneys for Defendant Citigroup Global Markets, Inc.** |
|  | One Chase Manhattan Plaza |
|  | New York, New York 10005-1413 |
| JAMES N. BENEDICT, ESQ. |  |
| DAVID R. GELFAND, ESQ. |  |
| DOUGLAS W. HENKIN, ESQ. |  |
|     Of Counsel |  |
|  | SHEARMAN & STERLING |
|  | **Attorneys for Individual Defendants Andres Bande, Larry Bautista, Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri, Stuart Rubin and Philip Seskin** |
|  | 599 Lexington Avenue |
|  | New York, New York  10022 |
| JEROME S. FORTINSKY, ESQ. |  |
| MICHAEL T. RASNICK, ESQ. |  |
| PANAGIOTIS KATSAMBAS, ESQ. |  |
| PAUL N. LEKAS, ESQ. |  |
|     Of Counsel |  |

*Copies Mailed to Counsel of Record*

**CONNER, Senior D.J.:**

Plaintiff Peter Loftin brought this proposed class action raising claims under the federal securities laws against defendants Flag Telecom Holding Group, Ltd. ("Flag"), Salomon Smith Barney, Inc. n/k/a Citigroup Global Markets, Inc. ("Citigroup"), Verizon Communications, Inc. ("Verizon") and nine individual defendants: Andres Bande, Edward McCormack, Andrew Evans, Larry Bautista, Stuart Rubin, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan (collectively the "individual defendants"). On October 18, 2002, this Court consolidated several similar suits against defendants, named Loftin lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach n/k/a Milberg Weiss Bershad & Schulman lead counsel. Plaintiff subsequently filed a Second Corrected Consolidated Amended Complaint ("2CCAC"), which Citigroup, Verizon and the individual defendants moved to dismiss. We dismissed the 2CCAC, but granted plaintiff leave to replead his claims against all defendants named therein. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004) (Conner, J.) (hereinafter "*Flag I*").

Plaintiff thereafter filed a Third Consolidated Amended Complaint ("3CAC" or the "Complaint") adding plaintiff Norman H. Hunter to the action, which Flag, Citigroup, Verizon and the individual defendants moved to dismiss. In an Opinion and Order dated January 12, 2005 (the "1/12/05 Order"),[1] this Court granted the motions to dismiss of Flag, Evans and Verizon, denied in part and granted in part Bautista's motion to dismiss and denied in their entirety the motions made by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan and Citigroup. Flag and Evans were dismissed with prejudice and Verizon was dismissed without prejudice.

---

[1] *In re Flag Telecom Holdings, Ltd. Sec. Litg.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005) (Conner, J.) (hereinafter "*Flag II*").

1

The only remaining claims against Citigroup and the individual defendants are for violations of sections 11 and 12(a)(2) of the Securities Act of 1933 arising out of a contract between Flag and Alcatel Submarine Networks ("Alcatel"). Those defendants now move to dismiss these claims pursuant to FED. R. CIV. P. 12(c). For the reasons stated herein, we deny the motions of Citigroup and the individual defendants in their entirety.

**BACKGROUND**

The facts of this case are set forth extensively in our previous opinion, familiarity with which is presumed. *See Flag II*, 352 F. Supp. 2d 429. Accordingly, we set forth only the facts and procedural history necessary for decision on the present motion.

**I.     Flag's IPO**

Flag offered its shares to the general public in an IPO on February 16, 2000. (3CAC ¶ 90.) Among other things, Flag's Prospectus revealed that it was in the process of expanding its global network through the construction of the Flag-Atlantic 1 cable system (the "FA-1 system"). (*Id.* ¶ 4.) The FA-1 system was a joint venture between Flag and GTS Transatlantic Holdings, Ltd. to build two digital fiberoptic cables connecting Paris and London to New York. (*Id.*; Registration Statement at 37.)

Plaintiffs allege that the disclosure in Flag's Prospectus concerning the capacity pre-sales on the FA-1 system was materially false or misleading. (3CAC ¶ 92.) According to plaintiffs, Alcatel entered into an improper agreement with Flag for the purchase of capacity on the FA-1 system. (*Id.* ¶¶ 92-93.) The Alcatel Sales Agreement, plaintiffs allege, was entered into as part of a "fraudulent

scheme" to inflate FA-1 system pre-sales to create the illusion that there was demand for capacity on the FA-1 system and to secure a line of credit necessary for construction of the system. (*Id.* ¶¶ 91-92, 98.)

On February 13, 2002, Flag issued a press release announcing its financial results for fiscal year 2001. (*Id.* ¶ 187.) The press release revealed that Flag was "reviewing [its] business in light of deteriorating market conditions" and stated that unless sufficient funds were found, "at some point in 2003 [Flag] will not have sufficient liquidity to continue . . . operations." (*Id.*) Flag indicated that it was unlikely that they would be able to raise the funds to recover under the current market conditions. (*Id.*) On the date of this announcement, Flag's stock price fell from $0.67 per share to $0.36 per share. (*Id.* ¶ 190.) In Flag's 10-K report for fiscal year 2001, filed on April 1, 2002, the company disclosed that it would not be able to "make the required interest payments, due March 30, 2002, on . . . [certain] outstanding senior notes." (*Id.* ¶ 192.) Flag filed a Chapter 11 bankruptcy petition on April 12, 2002. (Defs. Mem. Supp. Mot. Dismiss at 2.)[2] Over the next few weeks, Flag's stock price fell to $0.06 per share. (*Id.* at 3.)

On May 1, 2002, Loftin filed his original complaint (the "May 2002 Complaint"), alleging *inter alia*, that Flag's Prospectus contained materially false and misleading information. (May 2002 Complt. ¶¶ 22-53.) On September 26, 2002, all Flag common stock was cancelled pursuant to Flag's Chapter 11 plan as approved by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). (Defs. Mem. Supp. Mot. Dismiss at 4.) Prior to being cancelled,

---

[2] Defendant Citigroup has submitted "Citigroup Global Markets, Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Remaining Claims Asserted Against it in the Third Consolidated Amended Complaint." The individual defendants submitted a single "me-too" motion to dismiss incorporating by reference the arguments made by Citigroup.

Flag's stock was trading at $0.002 per share.[3] (*Id.*)

Two days before Loftin filed his 2CCAC, the Trustee of the Flag Litigation Trust (the "Trust"),[4] Andrew Rahl, filed a complaint in the Supreme Court of New York State, New York County (the "*Rahl* Complaint"). (3CAC, Preface.) The Trustee brought the claim against certain officers and directors of Flag, Dallah Abarak Holding Co. ("Dallah"), Verizon, Qwest Communications International Inc. ("Qwest"), Arthur Andersen Worldwide S.C., Arthur Andersen Bermuda and Arthur Andersen & Co. n/k/a Arthur Andersen LLP (collectively "Andersen") (all defendants collectively the "*Rahl* defendants").[5] *See Rahl v. Bande*, 316 B.R. 127 (S.D.N.Y. 2004) (Conner, J.). The *Rahl* defendants removed the action to this Court and we subsequently denied the Trustee's motion to remand the action to state court by Order and Opinion dated July 28, 2005. *See id.*

According to plaintiffs, they learned of the improper sales agreement by reading the *Rahl*

---

[3] During Flag's bankruptcy, the stock was trading as low as $0.0001 per share. (Defs. Mem. Supp. Mot. Dismiss at 4.)

[4] The Flag Litigation Trust is a New York liquidating trust created by Flag's Plan of Reorganization (the "Plan"), which was approved by the Bankruptcy Court on September 26, 2002. Under the Plan, certain Flag bondholders became the sole shareholders of Flag Telecom Group Limited ("FTGL"), the entity that emerged from Flag's bankruptcy case. *See Rahl v. Bande*, 316 B.R. 127, 130 (S.D.N.Y. 2004) (Conner, J.). The Plan also assigned all choses in action against the individual *Rahl* defendants possessed by Flag at the time of the filing of its Chapter 11 bankruptcy petition to the Trust for the benefit of the FTGL shareholders. *See id.*

[5] In the *Rahl* Complaint, the Trustee alleges that the individual *Rahl* defendants breached their fiduciary duties to the company by: (1) deepening Flag's insolvency for their personal gain; (2) issuing false financial statements; and (3) entering into transactions on terms that were unfavorable to Flag and advantageous to Verizon. *See Rahl*, 316 B.R. at 130. The Trustee asserts claims against Verizon seeking to avoid a fraudulent conveyance and to hold Verizon, Qwest and Dallah liable for aiding and abetting the individual *Rahl* defendants' breaches of fiduciary duties. Finally, the Trustee alleges that Andersen breached its fiduciary duties owed to Flag and committed professional malpractice. *See id.* at 130-31.

Complaint. (3CAC, Preface.) Plaintiffs claim that the Trustee "uncovered a scheme by which FLAG fraudulently inflated the amount of its so-called pre-sales" as disclosed in the Flag Prospectus. (*Id.* ¶¶ 91-92; Registration Statement at 50.) Plaintiffs contend that the factual allegations that appear in the *Rahl* Complaint are "particularly credible because the Trustee was granted access to certain internal FLAG documents and files, and the Trustee's Complaint contains factual allegations that are drawn from, and which reference, those internal documents and files." (3CAC, Preface.)

## II. The Alcatel Transaction

On January 12, 1999, Flag entered into a contract with Alcatel for the construction of the FA-1 system (the "Original Construction Contract"). (*Id.* ¶ 92.) The value of the Original Construction Contract was $646 million. (*Id.*) Flag announced in its Prospectus that financing for the construction would be provided by a credit facility arranged by Barclays Bank PLC ("Barclays") and through pre-sale of capacity on the FA-1 system. *Flag II*, 352 F. Supp. 2d at 452.

On September 20, 1999, Flag and Alcatel entered into new construction contract (the "Revised Construction Contract") to replace the Original Construction Contract. (3CAC ¶ 92.) The value of the Revised Construction Contract was $747 million. (*Id.*) According to plaintiffs, "[o]ther than the change to the contract sum, there were no other changes to the terms of the Original Construction Contract." (*Id.*) Defendants contend that Flag entered into the Revised Construction Contract to take advantage of new technologies that would allow the company to double the capacity available on the FA-1 system and offered copies of the Original Construction Contract and Revised Construction Contract to support their position. *Flag II*, 352 F. Supp. 2d at 452-53.

On October 8, 1999, Flag entered into another agreement with Alcatel wherein Alcatel agreed

5

to purchase 6.2 gigabits of capacity on the FA-1 system for $50 million. (3CAC ¶¶ 93-94.) This transaction was apparently disclosed in the Registration Statement. (*Id.* ¶ 91.) On the same date that Flag entered into this capacity sales agreement with Alcatel, Flag executed a new credit agreement with Barclays wherein Flag was required to commit $100 million in pre-sale capacity on the FA-1 system in order to secure the desired credit facility. *Flag II*, 352 F. Supp. 2d at 454. Plaintiffs contend that this agreement was not a legitimate customer purchase commitment and was entered into by Alcatel only because Flag agreed to pay Alcatel $100 million.[6] *Id.*

## DISCUSSION

**I.   Standard of Review**

On a motion to dismiss, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir. 1996) (quoting *Hughes v. Rowe*, 449 U.S. 5, 10 (1980)). "The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at trial but merely to determine whether the

---

[6] Plaintiffs offer the following allegations to support this contention: (1) Alcatel is a construction company, not a telecommunications service provider, and would have no use for such a large capacity (3CAC ¶ 94); (2) the Revised Construction Contract effected only a change in price (*id.* ¶¶ 92-94); (3) the capacity sales agreement with Alcatel allowed Flag to reduce the amount of capacity it was required to provide to Alcatel if Flag could find other customers that wished to purchase the capacity, an arrangement that Alcatel would not have approved if it actually intended to use the capacity (*id.* ¶ 97); and (4) the Alcatel Sales Agreement was executed in close temporal proximity to the credit agreement with Barclays that required Flag to secure pre-sales on its FA-1 system (*id.* ¶ 95).

6

complaint itself is legally sufficient.'" *AIG Global Sec. Lending Corp. v. Banc of Am. Sec.*, No. 01 Civ. 11448, 2005 WL 2385854 at *2 (S.D.N.Y. Sept. 26, 2005) (citing *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 672 (2d Cir. 1995)). A defendant's motion to dismiss should only be granted if "it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Id.* Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed. 1997); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir. 1995).

On a motion to dismiss pursuant to Rule 12(c), a court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiffs. *See* FED. R. CIV. P. 12(c); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998). The complaint need not set forth all the evidence supporting the claim; it need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 514 (2002). Furthermore, in assessing the legal sufficiency of a claim, the court may consider only the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference. *See* FED. R. CIV. P. 10(c); *Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999) (citations omitted). However the court may also consider documents that are "integral" to plaintiffs' claims, even if not explicitly incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991). A company's prospectus is integral to a plaintiff's § 11 and § 10(b) claims and can be considered in its entirety even where the plaintiff has quoted from it sparingly. *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991). Indeed, when considering a motion to

7

dismiss § 11 claims, the court must consider the prospectus as a whole. *See Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996).

## II. Negative Causation

A plaintiff need only plead a material misstatement or omission in the registration statement to establish a prima facie fraud claim under § 11 of the Securities Act; a plaintiff is not required to plead loss causation. *In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005). Under § 11, a plaintiff is entitled to damages,

> *Provided*, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable . . . .

15 U.S.C. § 77k(e) (emphasis in original).

The computation of damages under the statute is outlined as follows:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . .

15 U.S.C. § 77k(e).

The defendant may, however, raise the affirmative defense of "negative causation."[7] *Id.* This occurs "where a defendant proves that the decline in the value of the security in question was not caused by the material omissions or misstatements in the registration statement [and that the] plaintiff is not entitled to recover any damages." *Id.* In raising this defense, the defendant has a "heavy burden" of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement. *Akerman v. Oryx Commc'ns*, 810 F.2d 336, 340-41 (2d Cir. 1987) (citation omitted). "Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases. Defendants' burden, however, is not insurmountable; section 11(e) expressly creates an affirmative defense of disproving causation." *Id.* at 341 (citations omitted).

Defendants contend that plaintiffs cannot collect damages in this case because Flag's common stock became worthless after the Bankruptcy Court confirmed Flag's Chapter 11 plan canceling Flag common stock. (Defs. Mem. Supp. Mot. Dismiss at 7.) Plaintiffs allegedly did not learn of defendants' improper conduct with regard to the Alcatel Sales Agreement until after reading the *Rahl* Complaint. (*Id.*) Since the stock was not worth anything when plaintiffs claim the market learned about the allegedly improper Alcatel transaction, defendants argue there could not have been any value lost as a result of that transaction. (*Id.* at 8.) As a result, defendants argue, plaintiffs cannot have any damages and their claims must be dismissed. (*Id.*)

---

[7] The concept of negative causation differs from loss causation. Negative causation is an affirmative defense to a § 11 Securities Act claim, whereas loss causation is an element of a § 10(b) Exchange Act claim. *See In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005). Since there are claims only under §§ 11 and 12(a)(2) of the Securities Act of 1933 remaining, we will be addressing only the affirmative defense of negative causation.

9

Defendants rely on the "bright-line rule" (Defs. Reply Mem. Supp. Mot. Dismiss at 2) that "[t]he price decline before disclosure may not be charged to defendant." *Akerman*, 810 F.2d at 342. However, this rule "does not relieve Defendants of their burden of establishing the affirmative defense of negative causation." *WRT Energy*, 2005 WL 2088406, at *2. Any decrease in stock value is presumed to be caused by the misrepresentation in the registration statement, and it is "[t]he defendant [that] bears the burden of proving that the price decline was not related to the misrepresentations in the registration statement." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048, 1049 (2d Cir. 1995) (citing 15 U.S.C. § 77k(e)).

This Court has already determined that plaintiffs have "alleged facts sufficient to demonstrate that the Prospectus contained a material misstatement or omission in connection with the Alcatel Sales Agreement." *Flag II*, 352 F. Supp. 2d at 451. Defendants claim that the fall in stock price was due to the Bankruptcy Court's confirmation of Flag's Chapter 11 plan. (Defs. Mem. Supp. Mot. Dismiss at 7.) In support of their claim, defendants offer a chart indicating the publicly-available trading history of Flag stock from February 10, 2000 to March 31, 2004. (*Id.* at Ex. C.) Although this information indicates that the price of Flag stock fell during this period, it does not, without more, demonstrate that the decline was not due, at least in part, to the alleged misrepresentations concerning pre-sales in Flag's Prospectus, which presumably inflated the price level attained in the IPO and thereby heightened the loss when the price fell virtually to zero. Viewing the evidence in the light most favorable to plaintiffs, as is required, defendants have failed to satisfy their burden to establish the negative causation defense, and their motion is denied.

**III.     Statute of Limitations**

Defendants also contend that plaintiffs' claims are time barred.[8] (*Id.* at 9-14.) Under § 11 of the Securities Act, plaintiffs' fraud claims must be filed within three years of the IPO. 15 U.S.C. § 77m. In order to meet statute of limitations requirements, plaintiffs' claims must have been raised one year from the discovery of the untrue statement, and no more than three years after the security was offered to the public. *Id.* Therefore, to be timely, plaintiffs' claims must have been filed by February 13, 2003, a year after Flag's investors were placed on inquiry notice of their claims against Flag, and no later than February 16, 2003, three years after Flag's IPO. *Flag II*, 352 F. Supp. at 445. The allegations regarding the Alcatel transaction first appeared in the 3CAC filed on April 14, 2004. (Pls. Mem. Opp. Mot. Dismiss at 9.) In order to be timely, these allegations must relate back to the May 2002 Complaint, which was timely filed.

Defendants argue that plaintiffs' claims regarding the Alcatel transaction, as contained in the 3CAC, are unrelated to the claims in the May 2002 Complaint. (Defs. Mem. Supp. Mot. Dismiss at 9-11.) Specifically, the May 2002 Complaint claims that defendants omitted material facts from the IPO offering materials related to forces affecting the future market for fiber-optics networks. (*Id.* at 10.) Defendants assert that the May 2002 Complaint dealt with omissions that concerned Flag's "*future* ability to attract new customers and sell capacity on its networks" and did not allege that Flag

---

[8] Plaintiffs argue that this issue was already ruled upon by this Court in the 1/12/05 Order, and, under the doctrine of law of the case, cannot be reargued. (Pls. Mem. Opp. Mot. Dismiss at 17.) However, the issue we have previously addressed is related, but not the same. In the 1/12/05 Order we addressed whether the May 2002 Complaint was timely filed. *Flag II*, 352 F. Supp. 2d at 454 n.18. Citigroup argued that the 3CAC contained factual allegations that indicated that Loftin filed the May 2002 Complaint more than a year after he was placed on inquiry notice of his claims. *Id.* We held that the May 2002 Complaint was timely filed. *Id.* The issue presently before us is whether the 3CAC was timely filed and, if not, whether it relates back to the May 2002 Complaint.

11

misstated information regarding its "*historical* sales." (*Id.* at 10-11.) Apparently, defendants view their pre-sale transactions with Alcatel as "historical sales" which plaintiffs did not challenge in the May 2002 Complaint. (*Id.*) Defendants further assert that the claims in the May 2002 Complaint and the 3CAC are distinct because plaintiffs treat them differently.[9] (*Id.* at 11-12.) Finally, defendants argue that the May 2002 Complaint never mentioned Alcatel. (*Id.* at 10.)

Rule 15(c) states that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ." FED. R. CIV. P. 15(c). "The text of Rule 15 makes explicit Congress's intent that leave to amend a

---

[9] Defendants state:
> Plaintiffs themselves characterize their claims concerning Alcatel as new and distinct from their previous claim:
> - The 3CAC separates the allegations concerning the purported misstatements and omissions in the offering materials into two parts: paragraphs 80 through 90 elaborate upon Plaintiffs' original claim that the Prospectus misstated the supply and demand for capacity; whereas paragraphs 91 through 98, which come under the heading "Flag Entered Into a Phony 'Customer' Agreement with Alcatel," present Plaintiffs' new allegations. This confirms that the Alcatel allegations are conceptually distinct from Plaintiffs' original claim.
> - Plaintiffs' Memorandum of Law in Opposition to (i) Citigroup Global Markets, Inc.'s Motion to Dismiss and (ii) Point II of Flag Defendants' Motion to Dismiss Plaintiffs' Third Consolidate Complaint ("Memo") further separates Plaintiffs' new and old allegations. Plaintiffs' response to the defendants' motions to dismiss the '33 Act claims was divided into two parts. The first part was entitled "The Prospectus Misleadingly Suggests Strong And Growing Demand For Flag's Capacity" whereas the second was entitled "The Registration Statement Failed to Disclose That Flag Entered into Phony 'Presales' With Alcatel In Order To Meet A Bank Commitment."

(Defs. Mem. Supp. Mot. Dismiss at 11-12) (citations omitted).

complaint 'shall be freely given when justice so requires.'" *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) (citing FED. R. CIV. P. 15(a)). However, for an amendment to relate back it must arise out of the facts as stated in the original complaint. *See Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36 (2d Cir. 2002). "The purpose of Rule 15 'is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" *Siegel*, 714 F.2d at 216 (citing 6 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1471, at 359 (1971)). The Second Circuit held that Rule 15(c) is "to be liberally construed, particularly where an amendment does not 'allege a new cause of action but merely . . . make[s] defective allegations more definite and precise.'" *Id.* (citing *Glint Factors, Inc. v. Schnapp*, 126 F.2d 207, 209 (2d Cir. 1942)). "'The inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.'" *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir. 1973) (citing *Snoqualmie Tribe v. United States*, 372 F.2d 951, 960 (Ct. Cl. 1967)).

While it is undisputed that the May 2002 Complaint did not mention Alcatel, the May 2002 Complaint asserted fraud claims. The 3CAC provides more specific allegations of fraud with regard to the Alcatel transactions. For instance, the May 2002 Complaint alleges that Flag made false statements in its Registration Statement filed in connection with the IPO regarding its "state of the art" FA-1 system. (May 2002 Complt. ¶ 20.) Specifically, Flag failed to disclose that the "demand for these cables lines was extremely weak and getting weaker, and . . . the Company could not attract enough customers to make Flag Altantic-1 profitable." (*Id.*) The May 2002 Complaint goes on to allege that Flag misrepresented in its Registration Statement the success of the FA-1 system by stating that there were "presales in excess of $750 million." (*Id.* ¶ 22.) The 3CAC specifies the Alcatel transaction as an example that this claimed pre-sales figure was fraudulent. (3CAC ¶¶ 91-

13

98.) The May 2002 Complaint also alleges that Flag's Prospectus made misrepresentations that "led the investment community to believe that there was a huge demand for the Atlantic cable systems." (May 2002 Compt. ¶ 25.) The Alcatel transactions, as alleged in the 3CAC, are an example of how Flag exaggerated the demand for the FA-1 system. (3CAC ¶¶ 91-98.) These more specific allegations could not be asserted by plaintiffs until after they were brought to light by the filing of the *Rahl* Complaint.[10] *Flag II*, 352 F. Supp. 2d at 451.

This Court is unpersuaded by defendants' distinction between omissions regarding "future" sales and "historical" misrepresentations. The May 2002 Complaint not only alleges that Flag omitted relevant material regarding its future ability to attract new customers, but also implies that the "historical" pre-sales were overstated to support the prediction of strong demand for capacity of the FA-1 system. (May 2002 Complt. ¶¶ 22-26.) The allegations in the 3CAC concerning the spurious nature of the pre-sale to Alcatel is merely a specific example of such over-statement of pre-sales. This claim clearly arises out of the same conduct charged in the May 2002 Complaint and, under Rule 15(c), relates back to that Complaint. The claim is therefore not time-barred.

---

[10] In their papers, plaintiffs, in asserting that negative causation cannot be established, state that the February 13, 2002 Announcement "related, in part, to the subject matter of Plaintiffs' Securities Act claims." (Pls. Mem. Opp. Mot. Dismiss at 14.) In making this argument, plaintiffs state that the February 13, 2002 Announcement "contains a variety of disclosures, which Plaintiffs submit, relate to the subject-matter of Plaintiffs' Securities Act claims *and* decreased the value of FLAG's stock." (*Id.*) (emphasis in original). Defendants interpreted this to mean that plaintiffs were asserting that the February Announcement, and not the *Rahl* Complaint, made them aware of the Alcatel transaction. (Defs. Mem. Supp. Mot. Dismiss at 3.) Defendants argue that since plaintiffs previously told the Court that they learned of the Alcatel claims by reading the *Rahl* Complaint they were judicially estopped from now asserting that they learned of Alcatel claims through the *Rahl* Complaint. However, plaintiffs are not asserting that the February Announcement made them aware of the specific Alcatel claims; only that the February Announcement indicated some potential financial troubles that became apparent after learning of the Alcatel transaction through reading the *Rahl* Complaint. (Pls. Mem. Opp. Mot. Dismiss at 15.)

## CONCLUSION

For all of the foregoing reasons, the motion of defendant Salomon Smith Barney, Inc. n/k/a Citigroup Global Markets, Inc. and the individual defendants Andres Bande, Edward McCormack, Larry Bautista, Stuart Rubin, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan to dismiss pursuant to FED. R. CIV. P. 12(c) is denied.

SO ORDERED.
Dated: White Plains, New York
      January 18, 2006

*William C. Conner*
Sr. United States District Judge