ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - X
IN RE FLAG TELECOM HOLDINGS, LTD.          :      02 Civ. 3400 (WCC)
SECURITIES LITIGATION
                                            :          OPINION
THIS DOCUMENT RELATES TO:                             AND ORDER

                                            :
ALL ACTIONS                                        ~~FILED UNDER SEAL~~
- - - - - - - - - - - - - - - - - - - - - - X      UNSEALED 5/1/09

A P P E A R A N C E S :

                                   MILBERG LLP
                                   **Lead Counsel for Plaintiff and the**
                                   **  Class**
                                   One Pennsylvania Plaza
                                   New York, New York 10119-0165

BRAD N. FRIEDMAN, ESQ.
MATTHEW A. KUPILLAS, ESQ.
JAMES M. SHAUGHNESSY, ESQ.

       Of Counsel

                                   SHEARMAN & STERLING LLP
                                   **Attorneys for Individual Defendants**
                                   **  Andres Bande, Larry Bautista,**
                                   **  Lim Lek Suan, Edward McCormack,**
                                   **  Edward McQuaid, Daniel Petri,**
                                   **  and Philip Seskin**
                                   599 Lexington Avenue
                                   New York, New York  10022-6069

JEROME S. FORTINSKY, ESQ.
DANIEL H.R. LAGUARDIA, ESQ.
H. MIRIAM FARBER, ESQ.
GRACE J. LEE, ESQ.

       Of Counsel

                                   MILBANK, TWEED, HADLEY & McCLOY LLP
                                   **Attorneys for Defendant**
                                   **  Citigroup Global Markets, Inc.**
                                   One Chase Manhattan Plaza
                                   New York, New York 10005-1413

JAMES N. BENEDICT, ESQ.
DOUGLAS W. HENKIN, ESQ.
C. NEIL GRAY, ESQ.

       Of Counsel

                                   Copies Mailed to Counsel of Record 3/23/09

CONNER, Senior D.J.:

Plaintiffs Peter T. Loftin, Norman H. Hunter and Joseph Coughlin ("plaintiffs") bring this class action raising claims under the federal securities laws against Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc. ("Citigroup") and individual defendants,[1] namely, Andres Bande, Edward McCormack, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan (collectively, the "individual defendants," and together with Citigroup, "defendants") in connection with plaintiffs' purchase of common stock of Flag Telecom Holdings, Ltd. ("Flag").[2]  Plaintiffs

_____

[1]  Defendant Larry Bautista is no longer a defendant as to the claims alleging violations of the Securities Act of 1933, which are the claims that give rise to the instant motion.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 469 (S.D.N.Y. 2005) (Conner, J.) (*Flag II*).

[2]  In the spring of 2002, several lawsuits asserting claims under the federal securities laws were filed against Flag, Citigroup, Verizon Communications, Inc. ("Verizon") and the individual defendants (in addition to Andrew Evans, Vice President of Strategy and Marketing for Flag).  On October 18, 2002, this Court consolidated the suits against defendants, named Loftin lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach LLP n/k/a Milberg LLP as lead counsel.  Loftin subsequently filed a Second Corrected Consolidated Amended Complaint ("2CCAC"), which Citigroup, Verizon and the individual defendants moved to dismiss.  We dismissed 2CCAC, but granted plaintiff leave to replead his claims against all defendants named therein.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) (Conner, J.) (*Flag I*).  Plaintiff, thereafter, filed a Third Consolidated Amended Complaint ("3CAC") adding plaintiff Norman H. Hunter to the action, which Flag, Citigroup, Verizon and the individual defendants moved to dismiss.  In an Opinion and Order dated January 12, 2005, this Court granted the motions of Flag, Evans and Verizon, denied in part and granted in part Bautista's motion to dismiss and denied in their entirety the motions filed by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan and Citigroup.  *See Flag II*.  Plaintiffs' claims against Flag and Evans were dismissed with prejudice, and their claims against Verizon were dismissed without prejudice.  *See id.*  In an Opinion and Order dated September 4, 2007, we granted plaintiffs' motion to certify the class consisting of those who purchased Flag common stock between March 6, 2000 and February 13, 2002, as well as those who purchased Flag common stock pursuant to or traceable to Flag's initial public offering (the "IPO") between February 11, 2000 and May 10, 2000 (the "Class Period").  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147 (S.D.N.Y. 2007) (Conner, J.) (the "*Class Certification Decision*").  Finally, in an Opinion and Order dated September 28, 2007, we granted plaintiffs leave to amend the Complaint again.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 02 Civ. 3400 (WCC), slip

allege that the registration statement and prospectus filed in connection with the IPO contained materially false and misleading information in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "'33 Act" or the "Securities Act") and that, subsequent to the IPO, defendants made materially false and misleading statements regarding Flag's financial condition, thereby causing Flag securities to trade at artificially inflated prices in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act" or the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Defendants now move for summary judgment on the claims asserted under §§ 11, 12 and 15 of the Securities Act.  For the reasons set forth below, defendants' motion is denied in its entirety.


## BACKGROUND

The facts of this case are set forth extensively in our previous opinions, familiarity with which is presumed.  *See Flag I*; *Flag II*; the *Class Certification Decision*; and *Flag III*.  The instant motion for summary judgment raises the issue of whether disclosure in the registration statement regarding Flag's "presales" gave rise to material misrepresentations or omissions in violation of the Securities Act.  Accordingly, we recite only the facts relevant to our resolution of this issue and background facts that may be helpful in providing context.

Flag offered its shares to the general public in the IPO, pursuant to a registration statement (the "Registration Statement") filed with the Securities and Exchange Commission ("SEC"), which became effective on February 11, 2000, and a prospectus (the "Prospectus") describing the offering.

_____

op. (S.D.N.Y. Sept. 28, 2007) (*Flag III*).  Plaintiffs, thereafter, filed a Corrected Fourth Consolidated Amended Complaint on or about January 11, 2008 ("4CCAC" or "Complaint").

(Defs. R. 56.1 Stmt. ¶¶ 2, 4.)

Among other things, the Prospectus disclosed that Flag was in the process of expanding its network, which included a fiberoptic connection between London and Paris, through construction of the Flag-Atlantic 1 cable system (the "FA-1 System") to reach across the Atlantic Ocean. *Flag I*, 308 F. Supp. 2d 253. The estimated construction cost for the FA-1 System was $1.1 billion and the Prospectus disclosed that Flag intended to finance this cost through $600 million in bank financing, $100 million in capital contributions from existing shareholders and presales in excess of $750 million. (Defs. R. 56.1 Stmt. ¶¶ 12-13.)

About two years after the IPO, on February 13, 2002, Flag issued a press release announcing its financial results for the fiscal year 2001. *Flag II*, 352 F. Supp. at 442. The press release disclosed that Flag was "reviewing [its] business in the light of deteriorating market conditions" and that, unless sufficient funds were raised, "at some point in 2003 [Flag] will not have sufficient liquidity to continue [its] operations." *Id*. Flag indicated that, given then-existing market conditions, it would be unlikely that Flag would raise the needed funds. *Id*. Subsequent to this announcement, Flag's stock price fell 46% to $0.36 per share. *Id*. Flag filed a petition for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 1110, *et seq*.) ("Chapter 11") on April 12, 2002. *Id*.

## I.   Flag's Relationship with GTS and the Formation of FAL

GTS TransAtlantic Holdings Limited ("GTS") was a pan-European provider of broadband, internet, data and voice services to high-usage customers. (Defs. R. 56.1 Stmt. ¶ 17.) In September 1998, GTS committed to purchase $200 million of capacity on the FA-1 System. (*Id*. ¶ 18 (citing

3

McCormack Decl., Ex. 1).)  At some point after that commitment, GTS and Flag discussed an equity investment by GTS in the FA-1 System.  (Pls. R. 56.1 Stmt. ¶ 19 (citing McCormack Decl., Ex. 2).)  Pursuant to a Shareholders Agreement dated November 27, 1998 (as subsequently amended and restated, the "FAL Shareholders Agreement"), GTS and Flag became equity partners in FLAG Atlantic Limited ("FAL"), which was a joint venture formed for the purpose of constructing the FA-1 System.  (*Id*. ¶¶ 20-21; Defs. R. 56.1 Stmt. ¶ 15.)

## II.     FAL's Relationship with Alcatel

FAL entered into a construction contract on January 12, 1999 with Alcatel Submarines Network ("Alcatel") for the construction of the sub-sea portion of the FA-1 System.  (Defs. R. 56.1 Stmt. ¶ 27.)  Under the terms of the construction contract, FAL was to pay Alcatel $646 million.  (*Id*. ¶ 29.)  Pursuant to a subsequent revision of the construction contract in September of 1999, the parties increased the price to $747 million.  (*Id*. ¶¶ 30-32.)  Under the revised construction contract, Alcatel undertook to begin construction of the sub-sea portion of the project by March 31, 2001 and to have the system fully operational by June 30, 2001.  (*Id*. ¶ 33.)

## III.    The Barclays Credit Agreement

On October 8, 1999, FAL entered into a credit agreement with Barclays Bank plc ("Barclays") that provided a credit facility consisting of $575 million in construction loans and $25 million in "revolving loans" for the funding of the construction of the FA-1 System (the "Barclays Credit Agreement").  (*Id*. ¶ 34.)  A copy of the Barclays Credit Agreement was appended to the

Registration Statement.[3]  (Defs. R. 56.1 Stmt. ¶ 35.)  "The credit facility was provided subject to a commitment by each of [Flag] and GTS to provide a $100 million capital contribution no later than October 31, 2000, and a commitment by [Flag] and GTS to purchase or arrange for the purchase of $300 million in FA-1 capacity on a presale basis."  (*Id*. ¶ 37.)  Pursuant to the Barclays Credit Agreement, the required $300 million in presales consisted of a $200 million presale commitment from GTS and a $100 million presale commitment from, or arranged by, Flag.  (*Id*. ¶ 38.)

The Barclays Credit Agreement made it possible for Flag to achieve "financial closure"; defendants define "financial closure" as "confirmation that all the financing necessary to build the FA-1 was legally committed."  (*Id*. ¶ 39.)  Flag designated a "date certain" by which pre-conditions to financial closure, including required capital contributions and presales, must be complete.  (*Id*. ¶¶ 40-41.)[4]  Defendants contend that customers were reluctant to enter into presale agreements before it was certain that the preconditions to financial closure would be satisfied and that project funding for the FA-1 System would be provided.  (*Id*. ¶ 42.)[5]

## IV.    **Presales of FA-1 Capacity**

The Prospectus included a section titled "Liquidity and Capital Resources," which disclosed that "[FAL] has financed the $1.1 billion in construction costs for the [FA-1 System] through a $600

---

[3]  Plaintiffs contend that the appended document is neither a true nor an original copy. (Pls. R. 56.1 Stmt. ¶ 34.)

[4]  Plaintiffs dispute this, however, they direct the Court to a document that supports the fact that Flag imposed internal deadlines to meet these pre-conditions. (Pls. R. 56.1 Stmt. ¶ 40.)

[5]  Plaintiffs dispute this statement on the grounds that it is inadmissible as "incompetent, hearsay, lacking foundation and incompetent expert opinion."  (Pls. R. 56.1 Stmt. ¶ 42.)

million bank financing, $100 million in capital contributions from each of its shareholders and presales in excess of $750 million." (Pls. R. 56.1 Stmt. ¶ 13.)  The Prospectus also included a section titled "Employing a Flexible and Comprehensive Finance Plan," which contained the statement that "[Flag] also [is] financing the construction of [the FA-1 System] on a project finance basis, in collaboration with our joint venture partner, through borrowings under [FAL]'s existing credit facility, equity contributions to be made by us and our joint venture partner and advance capacity sales, in excess of $750 million . . . which have already [been] committed." (*Id.* ¶ 14.) These statements concerning FAL's presales form the basis of plaintiffs' allegation that the Prospectus and Registration Statement contained materially misleading statements and material omissions.

As of December 31, 1999, FAL had entered into nine presale agreements.  (*Id.* ¶ 43.) Defendants describe the presales as the selling of "large tranches of capacity on the [FA-1 System] to companies that knew they would need substantial capacity and [Flag] gave them price discounts . . . in return for making a commitment before the cable had been built." (Defs. R. 56.1 Stmt. ¶ 44 (citing Fortinsky Decl., Ex. 20 at 35).)  The total value of the presales was approximately $774 million.  (Fortinsky Decl., Ex. 20 at 153.)

**A.    Presales with Related Entities**

**1.    GTS Presale Contract**

Pursuant to the FAL Shareholders Agreement, GTS was obligated to make a presale purchase of capacity on the FA-1 System "at cost, for an aggregate amount of US$200 million."  (Defs. R. 56.1 Stmt. ¶¶ 23-24; Pls. R. 56.1 Stmt. ¶ 23.)  On October 8, 1999, GTS purchased capacity on the

6

FA-1 System in accordance with its obligation under the FAL Shareholders Agreement. (Defs. R. 56.1 Stmt. ¶¶ 46-47.) A copy of the GTS presale capacity purchase agreement was appended to the Barclay's Credit Agreement, a copy of which was appended to the Registration Statement. (*Id.* ¶¶ 47-48.) On October 13, 1999, Flag and GTS issued a joint press release regarding the GTS presale capacity purchase agreement and GTS stated in its 1999 10-K annual report that the supply of capacity from the FA-1 System would allow it to "accommodate the growing volume of transatlantic traffic at a competitive low cost base." (*Id.* ¶¶ 49-51.)[6] In January 2000, Gerard Caccappolo of GTS stated in a news article that GTS "think[s] [the FA-1 System] is hopefully sufficient to carry us through that period until the next cable comes out." (Defs. R. 56.1 Stmt. ¶ 52.)[7]

In October 2000, Flag purchased GTS's shares in FAL and GTS agreed to maintain its commitment to purchase capacity on the FA-1 System under the terms of the presale capacity purchase agreement. (Pls. R. 56.1 Stmt. ¶ 53.) Defendants contend that, between November 1999 and July 2001, GTS made payments under the presale capacity purchase agreement totaling $200 million and that, as of March 28, 2002, GTS was utilizing capacity that it had purchased under this agreement. (Defs. R. 56.1 Stmt. ¶¶ 54-55.)[8]

---

[6] Plaintiffs dispute these statements on the grounds that they rely on documents that are inadmissible on a variety of grounds, including hearsay and lack of foundation. (Pls. R. 56.1 Stmt. ¶¶ 49-51.)

[7] Plaintiffs dispute these statements on the grounds that they rely on documents that are inadmissible on a variety of grounds, including hearsay and lack of foundation. (Pls. R. 56.1 Stmt. ¶ 52.)

[8] Plaintiffs dispute these statements on the grounds that they rely on documents that are inadmissible on a variety of grounds, including hearsay and lack of foundation. (Pls. R. 56.1 Stmt. ¶¶ 54-55.)

## 2.    **Bell Atlantic Presale Contract**

The Registration Statement disclosed that, just before the IPO, Bell Atlantic Corporation (along with its affiliates or its successor, Verizon Global Solutions, as applicable, "Bell Atlantic") was a 37 percent shareholder in Flag.  (Defs. R. 56.1 Stmt. ¶ 62.)  On February 8, 1999 and August 4, 1999, Bell Atlantic contracted with Flag (the "August Bell Atlantic Agreement") for the purchase of $15 million of capacity on the FA-1 System, with a first installment payment of $5.5 million to occur on January 31, 2000.  (Pls. R. 56.1 ¶ 63; Defs. R. 56.1 ¶¶ 64-65.)[9]  Defendants aver that the $5.5 million installment payment under the August Bell Atlantic Agreement was intended for use as security for Flag's obligations under the Barclays Credit Agreement.  (Defs. R. 56.1 Stmt. ¶ 66, (citing McCormack Decl., Ex. 29 *and* Fortinsky Decl., Ex. 18 at 44-46).)[10]  However, Bell Atlantic never paid the $5.5 million first installment because the August Bell Atlantic Agreement was terminated at financial closure on October 8, 1999, in accordance with its terms.  (Defs. R. 56.1 Stmt. ¶ 67.)

On October 7, 1999, Bell Atlantic entered into a new agreement to purchase $15 million of FA-1 System capacity from FAL (the "October Bell Atlantic Agreement").  (*Id*. ¶ 68.)  The Registration Statement disclosed that "Bell Atlantic has agreed to purchase $15 million of capacity on the [FA-1 System] under a Capacity Purchase Agreement" and a copy of the October Bell

---

[9]  Plaintiffs dispute this statement, citing the same contract in the record as do defendants. (Pls. R. 56.1 Stmt. ¶ 65.)  Upon review of the contract, defendants' statement is supported by the contract.  (Petri Decl., Ex. 2 (August Bell Atlantic Agreement).)

[10]  Plaintiffs dispute this statement, directing the Court to the August Bell Atlantic Agreement.  (Pls. R. 56.1 Stmt. ¶ 66.)

Atlantic Agreement was appended to the Registration Statement.  (Pls. R. 56.1 Stmt. ¶ 69.)[11]
Defendants aver that Bell Atlantic (through its successor, Verizon) made payments totaling
$15,019,703.10 between November 1999 and August 2001.  (Defs. R. 56.1 Stmt. ¶ 70.)[12]

Until December 22, 1999, Bell Atlantic was prohibited, under § 271 of the Communications
Act, from providing or marketing long distance telecommunications services originating in a state
in which Bell Atlantic was an incumbent provider of local telephone service until the Federal
Communications Commission ("FCC") approved its application to provide such services.  (Pls. R.
56.1 Stmt. ¶ 71 (citing Fortinsky Decl., Ex. 15 at 55).)  Defendants aver that Bell Atlantic had
anticipated that the FCC would grant approval for Bell Atlantic to provide long distance services
and, accordingly, purchased capacity on the FA-1 System prior to FCC approval.  (Defs. R. 56.1
Stmt. ¶ 73.)  Plaintiffs dispute the fact that the FCC's approval was "anticipated" by Bell Atlantic.
(Pls. R. 56.1 Stmt. ¶¶ 73, 76.)   On December 22, 1999, Bell Atlantic obtained the necessary
regulatory approval from the FCC and began providing long distance services originating in New
York beginning January 5, 2000.  (Defs. R. 56.1 Stmt. ¶¶ 76-77.)  Invoices from Flag to Bell Atlantic
reflect that Bell Atlantic activated the purchased capacity between June of 2001 and February of
2002.  (Defs. R. 56.1 Stmt. ¶ 78 (citing McCormack Decl., Ex. 20).)[13]

---

[11]  Plaintiffs aver that the document appended was neither a true nor a complete copy.
(Pls. R. 56.1 Stmt. ¶ 69.)

[12]  Plaintiffs dispute this on the ground that the statement relies on documents that are
inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1
Stmt. ¶ 70.)

[13]  Plaintiffs dispute this statement on the ground that it relies on documents that are
inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1
Stmt. ¶ 78.)

### 3.    GTE Presale Contract

On October 8, 1999, GTE Global Networks Incorporated ("GTE") entered into an agreement to purchase $7.5 million of capacity on the FA-1 System.  (Defs. R. 56.1 Stmt. ¶ 56.)  The Registration Statement disclosed this agreement.  (*Id*. ¶ 57.)[14]  The Registration Statement also disclosed that Bell Atlantic and GTE entered into an "Agreement" and "Plan of Merger" on June 27, 1998. (Defs. R. 56.1 Stmt. ¶ 59.)  Defendants aver that GTE (through its successor) made payments to FAL totaling $7.5 million between December 1999 and November 2001, pursuant to the FA-1 capacity purchase agreement.  (*Id*. ¶¶ 60-61.)[15]

### 4.    Alcatel Presale Contract

On October 8, 1999, Alcatel entered into an agreement with FAL (the "Alcatel Agreement") whereby Alcatel committed to purchase $50 million of capacity on the FA-1 System.  (Defs. R. 56.1 Stmt. ¶ 99.)[16]  The Alcatel Agreement provided that Alcatel's $50 million commitment would be reduced by the amount of any cash that FAL received from capacity sales made after October 8, 1999 and the amount of any capacity commitments made after October 8, 1999 by creditworthy purchasers.  (Defs. R. 56.1 Stmt. ¶ 100.)

---

[14]  Plaintiffs aver that the document attached to the Registration Statement is not a true or complete copy of the agreement between FAL and GTE.  (Pls. R. 56.1 Stmt. ¶ 57.)

[15]  Plaintiffs dispute these statements on the grounds that they rely on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶¶ 60-61.)

[16]  Plaintiffs dispute this statement, citing the same agreement as do defendants.  (Pls. R. 56.1 Stmt. ¶ 99.)  Upon review of the agreement, defendants' statement is supported by the agreement.  (McCormack Decl., Ex. 31 (Alactel Presale Commitment Letter).)

On October 26, 1999, Alcatel's commitment under the Alcatel Agreement was reduced by $7.5 million to $42.5 million and on January 11, 2000, Alcatel's commitment under the Alcatel Agreement was reduced to zero.  (*Id*. ¶¶ 101-02.)  Defendants aver that the Alcatel commitment was not counted in the "presales in excess of $750 million" disclosed in the Prospectus.  (*Id*. ¶ 103.)

## B.    Other Presales

On November 17, 1999, PSINetworks Company ("PSINet") entered into an agreement to purchase $274.8 million of capacity on the FA-1 System.  (*Id*. ¶ 79.)  Defendants aver that PSINet made payments totaling $139,140,000 pursuant to its capacity purchases between October 8, 1999 and March 20, 2001.  (*Id*. ¶ 80.)[17]  PSINet filed a petition for bankruptcy protection under Chapter 11 on May 31, 2001.  (Defs. R. 56.1 Stmt. ¶ 81.)

On October 8, 1999, Teleglobe USA, Inc. ("Teleglobe") entered into an agreement to purchase $255 million of capacity on the FA-1 System.  (*Id*. ¶ 82.)  Defendants aver that, between November 1999 and December 2001, Teleglobe made payments totaling $248,521,257 pursuant to its capacity purchase agreement and, as of March 28, 2002, had activated four wavelengths of capacity under that agreement.  (*Id*. ¶¶ 83-84.)[18]  Teleglobe filed a voluntary petition for bankruptcy protection under Chapter 11 on May 28, 2002.  (Defs. R. 56.1 Stmt. ¶ 85.)

On December 31, 1999, Saudi Telecom Company ("Saudi Telecom") entered into an

---

[17]  Plaintiffs dispute this statement on the ground that it relies on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶ 80.)

[18]  Plaintiffs dispute these statements on the ground that they rely on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶¶ 83-84.)

agreement to purchase $8 million of capacity on the FA-1 System.  (*Id.* ¶ 86.)  According to defendants, between May 2000 and November 2001, Saudi Telecom made payments totaling $7,999,902.50 pursuant to its capacity purchase agreement and, as of July 1, 2002, had activated three wavelengths of capacity pursuant to its capacity purchase agreement.  (*Id.* ¶¶ 87-88.)[19]

On November 29, 1999, AT&T Communications (UK) Limited ("AT&T (UK)") entered into an agreement to purchase $6.75 million of capacity on the FA-1 System.  (Defs. R. 56.1 Stmt. ¶ 89.)  Defendants aver that AT&T (UK) made an initial payment of $675,000 on February 10, 2000, pursuant to its capacity purchase agreement.  (*Id.* ¶ 90.)[20]  On February 29, 2000, AT&T (UK) was acquired by Viatel, Inc. ("Viatel") and on May 2, 2001, Viatel filed a petition for bankruptcy protection under Chapter 11.  (Defs. R. 56.1 Stmt. ¶¶ 91-92.)

On October 8, 1999, Telekom Malaysia Berhad ("TMB") entered into an agreement to purchase $4 million of capacity on the FA-1 System.  (*Id.* ¶ 93.)  Defendants aver that TMB made payments totaling $4 million between November 1999 and October 2001 and that TMB activated one wavelength of capacity on April 30, 2002.  (*Id.* ¶¶ 94-95.)[21]

On October 8, 1999, Singapore Telecommunications Limited ("Singtel") entered into an agreement to purchase $2,990,000 of capacity on the FA-1 System.  (Defs. R. 56.1 Stmt. ¶ 96.)

---

[19]  Plaintiffs dispute these statements on the ground that they rely on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶¶ 87-88.)

[20]  Plaintiffs dispute this statement on the ground that it relies on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶ 90.)

[21]  Plaintiffs dispute these statements on the ground that they rely on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶¶ 94-95.)

Defendants aver that Singtel made payments totaling at least $2,500,000 between December 1999 and August 2001 pursuant to that agreement and that Singtel activated one wavelength of capacity on July 11, 2001.  (*Id.* ¶¶ 97-98.)[22]

Plaintiffs now bring this lawsuit claiming, *inter alia*, that the disclosures in the Registration Statement and Prospectus regarding Flag's "presales" contained material misrepresentations or omissions in violation of the Securities Act.

## DISCUSSION

### I.   Legal Standard

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v.*

---

[22]  Plaintiffs dispute these statements on the ground that they rely on documents that are inadmissible for a variety of reasons, including hearsay and lack of foundation.  (Pls. R. 56.1 Stmt. ¶¶ 97-98.)

*Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof. . . .  The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial. . . .  A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial. . . .  The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 U.S. Dist. LEXIS 11162, at *6-7 (W.D.N.Y. July 30, 1997 (internal quotation marks and citations omitted).


## II.    Plaintiffs' Securities Act Claims

Plaintiffs bring suit under §§ 11, 12(a)(2) and 15 of the Securities Act.  In order to prevail on a claim under Section 11, plaintiff must prove, *inter alia*, that "the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 12(a)(2) of the Securities Act allows the purchaser of a security to bring a private action against a seller who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."  15 U.S.C. § 77l(a).  Section 15 "extends Securities Act liability to [e]very person who, by or through stock ownership, agency, or otherwise . . . controls any persons liable under [section 11] or [section 12]."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d

236, 245 (S.D.N.Y. 2007), *quoting* 15 U.S.C. § 77o (internal quotation marks omitted; alterations in original).

The Second Circuit has stated that "a violation of Section 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (internal quotation marks and citations omitted). The disclosure provided in a prospectus is adjudged by the facts as they existed when the applicable registration statement became effective. *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 923 (D.N.J. 1998). Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities Act] by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A claim under this section may be asserted against every person who signed the registration statement, the directors of the issuer and the underwriters of the securities. 15 U.S.C. § 77k(a). The test for determining whether the prospectus contained a material misstatement or omission is "whether the defendants' representations [in the prospectus], taken together and in context, would have misled a reasonable investor." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

### A.   <u>Materiality of the Presales</u>

Our preliminary inquiry is whether the allegedly untrue, misleading or omitted statements in the Prospectus and Registration Statement were material. Materiality is found where there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."

*Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002), quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted).  "Materiality is a mixed question of law and fact," and only if an omission or misstatement is "so obviously important or unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality is the issue appropriately resolved as a matter of law by summary judgment."  *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 188 (S.D.N.Y. 2003), quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (internal quotation marks omitted).

Plaintiffs aver that the challenged statements,[23] and alleged omissions related thereto, were material because they implied profitability and demand for the FA-1 System, implications that were important to a reasonable investor.  Defendants counter that the disclosures were not material because they could not have been interpreted by a reasonable investor as indications of profitability or demand as, contextually, such disclosures related to the securing of project financing and appeared in sections titled, "Employing a Flexible and Comprehensive Financing Plan" and "Liquidity and Capital Resources."  Yet Evans, former Vice President of Strategy and Marketing at Flag, testified that Flag used presales not only to reduce the "financial risk of the project," but also to "validate[] demand."  (Fortinsky Decl., Ex. 20 (Evans Dep.) at 35.)  Whether a reasonable investor could have gleaned Evans's insight with respect to the use of presales by reading the Prospectus and Registration

---

[23]  The salient quotes from the Prospectus are: "[Flag] has financed the $1.1 billion in construction costs for the [FA-1] through a $600 million bank financing, $100 million in capital contributions from each of its shareholders and presales in excess of $750 million" and "[w]e also are financing the construction of the [FA-1] on a project finance basis, in collaboration with our joint venture partner, through borrowings under [FAL's] existing credit facility, equity contributions to be made by us and our joint venture partner and advance capacity sales, in excess of $750 million of which have already been committed."  (Fortinsky Decl., Ex. 15 at 34, 42.)

Statement is not a question with so obvious an answer that we can resolve it as a matter of law. Therefore, this Court leaves open the possibility that a reasonable investor could have understood presales to reflect market demand.

Market demand is material to a reasonable investor. *See In re Alstom, SA Sec. Litig.*, 406 F. Supp. 2d  433, 453-54 (S.D.N.Y. 2005).  Consequently, a reasonable investor who believed that presales reflected market demand for the FA-1 System would have found presales, and the extent to which they were an accurate reflection of market demand, to be material to his or her investment. *See, e.g.*, *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001).  In other words, facts regarding the circumstances underlying the presales could "significantly alter[] the total mix of information available," thereby rendering those facts material. *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).  At the very least, the materiality of the presales is not "so obviously . . . unimportant to a reasonable investor that reasonable minds cannot differ." *In re Alliance Pharm.*, 279 F. Supp. at 188.

### 1.    "Bespeaks Caution" Doctrine

Under the "Bespeaks Caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *DeMaria v. Andersen*, 318 F.3d 170, 182 (2d Cir. 2003); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).  The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed. *Olkey*, 98 F.3d at 5-6.  The requirement that the cautionary language match

the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language.  *Miller*, 473 F. Supp. 2d at 579.

Defendants aver that the "risk factors disclosed in the Registration Statement" and the "explicit[] discuss[ion] [of] competition faced by [Flag] in the trans-Atlantic services market covered by the FA-1 cable" warrant a grant of summary judgment in their favor.  (Defs. Mem. Supp. Partial Summ. J. at 29-31.)[24]  However, the risk that plaintiffs claim was not disclosed is not merely competition for demand, but rather the risk that the presales were inadequate measures of demand. Because "presales" appear nowhere in the cautionary language, this Court cannot rule as a matter of law that the cautionary language in the Prospectus and Registration Statement was sufficient to inform investors of the risks of relying on presales as a measure of demand.  *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled.").

### B.    **Untrue Statements**

In highly distilled form, defendants argue that this Court should grant their motion for summary judgment in full because "the evidence shows that Flag had approximately $774 million in FA-1 presales at the time the Registration Statement became effective" (Defs. Mem. Supp. Partial Summ. J. at 5) and, therefore, the statements regarding presales in the Prospectus and Registration

---

[24]  The risk disclosures to which defendants direct the Court are: (1) "[w]e believe our key competitors in the trans-Atlantic services market are as follows . . . " and (2) "because our product offerings are expanding and the telecommunications industry is changing significantly, we face competition and pricing pressure from a wide variety of sources. . . ."  (Defs. Mem. Supp. Partial Summ. J. at 29-30 (quoting Amendment 3 at 53, 11).)

Statement were not untrue.[25]

The Court declines to decide the truth or untruth of the statements regarding presales because, even assuming that the presales were supported by valid and binding contracts in the amount stated in the Prospectus, this would not preclude a finding by a trier of fact that those presales were disclosed to investors in a materially misleading way. *See, e.g.*, *Halperin*, 295 F.3d at 357 ("[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions . . . [would] mislead a reasonable investor"); *McMahon & Co. v. Wherehouse Entm't Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"). The Court, having established that the presale statements need not be factually untrue to be materially misleading, and, therefore, the truth of the

---

[25] In support of this claim, defendants direct the Court to *Flag III*, wherein we stated that "if the so-called presales were in fact nothing more than financing facilities," it would be "misleading to state that the $750 million figure consists of proceeds from presales of capacity on the FA-1 system." (Defs. Mem. Supp. Partial Summ. J. at 28, *construing Flag III*, slip op. at 14 (emphasis omitted).) Defendants assert that Flag's presales were not mere "financing facilities" and, therefore, the statements regarding those presales were not untrue. *Id*. In construing our language, defendants presume that we intended "financing facilities" to mean "essentially a loan." (*Id*. at 28.) We did not, however, intend our words to be assigned so narrow a definition. Rather, "financing facilities" may refer to any number of transactions, including those memorialized by valid and binding contracts, to the extent such transactions are employed to facilitate a financial transaction. Moreover, defendants fail to recognize that we did not *limit* the circumstances under which the disclosure regarding presales could be misleading and we did not state that such disclosure could be misleading *only if* the presales were mere financing facilities. As we noted in the same paragraph in *Flag III* as the sentence to which defendants now direct us, "implicit in the disclosure of presales was a representation as to the buyers' actual demand for capacity on the system," *Flag III*, slip op. at 14, and the potential for that representation to be misleading does not depend on whether the presales were financing facilities. Thus, while plaintiffs and defendants each set forth articulate, extensive and well-reasoned arguments as to whether Flag's presales were "financing facilities" or "valid and binding contracts," we find that this issue is not outcome-determinative.

statements is not outcome-determinative, turns now to the question of whether a reasonable investor

could have been misled by the presale statements.

### C.   <u>Misleading Statements</u>

Assuming, without deciding, that the statements regarding presales were factually true, they

may nevertheless be misleading.  On page 42 of the Prospectus, defendants stated that "[w]e also are

financing the construction of the [FA-1] on a project finance basis, in collaboration with our joint

venture partner, through borrowings under [FAL's] existing credit facility, equity contributions to

be made by us and our joint venture partner *and* advance capacity sales, in excess of $750 million

of which have already been committed."  (Fortinsky Decl., Ex. 15 at 42) (emphasis added.)  This

language appears to separate "advance capacity sales, in excess of $750 million" from "equity

contributions . . . by us and our joint venture partner."  However, it appears from the record that the

$750 million in presales may have *included* $200 million from GTS, in which case the contributions

from Flag's joint venture partner would not be a distinct source of financing from the presales and

should not be separated from presales in the Prospectus.  (*See* Defs. Mem. Supp. Partial Summ. J.

at 15, noting that GTS, Flag's joint venture partner, purchased presale capacity of $200 million.)  A

finder of fact may determine that the wording of this statement is materially misleading.

Similarly, the statement regarding presales found on page 34 of the Prospectus could, by its

wording, be misleading to a reasonable investor.  (Fortinsky Decl., Ex. 15 at 34.)  There, defendants

stated that "[Flag] has financed the $1.1 billion in construction costs for the [FA-1] through a $600

million bank financing, $100 million in capital contributions from each of its shareholders and

presales in excess of $750 million."  *Id*.  This statement appears to list three *separate* sources of

financing: (1) "bank financing;" (2) "capital contributions from shareholders;" and (3) "presales." However, it is clear, based on the record, that these were not three distinct sources, but rather were interrelated sources. Indeed, defendants admit that the "presales were used to finance the construction of the FA-1 cable *and* that the bank financing was contingent on obtaining $300 million in presales of capacity." (Defs. Mem. Supp. Partial Summ. J. at 32 (emphasis in original).) While defendants contend that the Prospectus was clear in its disclosure on these points, a reasonable investor may disagree. This Court cannot substitute its own reasoning for that of a jury and hold, as a matter of law, that this wording was not misleading to a reasonable investor.

### D.    Omissions

The Court, having established earlier in this Opinion that a reasonable investor could have considered the circumstances underlying the presales to be material, turns now to the question of whether defendants adequately disclosed those circumstances in the Prospectus and Registration Statement. It is well settled that the principle of *caveat emptor* does not apply to a public offering of stock and, therefore, investors need not cobble together information from various parts of the Registration Statement to uncover material information. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994); *United Paperworks Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983) ("Full and fair disclosure cannot be achieved through piecemeal release of subsidiary facts which[,] if stated together[,] might provide a sufficient statement of the ultimate fact.") (alteration added).

Defendants direct the Court to various portions of the Prospectus and Registration Statement,

including its exhibits and amendments, that disclose Flag's relationships with GTS and Bell Atlantic, that the Barclays Credit Agreement was conditioned on a GTS presale and that some of the presales were made "at cost."  (Defs. Mem. Supp. Partial Summ. J. at 33-34 (citing Registration Statement, Amendments 3, 4, Annex 6 and Ex. 10.4).)  However, such disclosures should have appeared, but did not appear, in several key sections of the Prospectus or in sections of the Prospectus that contained statements regarding presales.  Specifically, pages 34 and 42 of the Prospectus contain statements regarding presales and there is no disclosure in close proximity to those pages regarding the material facts surrounding those presales.  Further, page 63 of the Prospectus contains a section entitled "Certain Transactions," which discusses "various agreements between [Flag's] subsidiaries and [Flag's] shareholders (or their affiliates) for the development, construction, operation, financing and marketing of [FA-1]."  There is no reference in that section to the presale agreements with those subsidiaries and shareholders, though a finder of fact may determine that it was misleading to omit such information.  *See In re Alstom*, 406 F. Supp. 2d at 453 ("affirmative statements regarding [defendant's] robust [] sales . . . indicated strong demand . . . without disclosing that this demand was in fact bolstered by [defendant's] own financing . . . [and this] omission . . . created an impression of a state of affairs that differed in a material way from the one that actually existed") (internal quotation marks and citation omitted).

To the extent defendants rely on amendments, annexes and exhibits as a means of supplementing those areas so as to fully disclose material facts, such reliance is misplaced.  *See United Paperworkers*, 985 F.2d at 1199 ("buried" disclosures are inadequate); *see also In re Alstom*, 406 F. Supp. 2d at 453 n.11 ("[a]n investor should not be called upon to piece together buried information from distinct parts of financial statements").  This Court cannot rule that the scattered

22

disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors.

Defendants direct the Court to a number of cases in this Circuit that have granted summary judgment for the defendants where the plaintiffs' claims rely on the defendants' failure to adequately disclose investment or accounting principles. *Olkey*, 98 F.3d 2; *Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980); *Miller*, 473 F. Supp. 2d 571. Each of these cases, however, is distinguishable from the instant case. In *Olkey*, the court found that adequate disclosure of investment risk was "positioned on the second page of each prospectus such that no reasonable investor could miss it" and that "the juxtaposition of [] two sentences creates an unmistakable inference [of the relevant investment risk]." 98 F.3d at 6-7. The dismissal of the claim in *Olkey* was thus premised on the court's finding that consecutive disclosures made in a single paragraph adequately disclosed investment risk. The proximity of the cautionary disclosures to the potentially misleading statement is an important factor that distinguishes *Olkey* from this case. Here the alleged cautionary disclosures are found much farther from the allegedly misleading statements. At issue in *Greenapple* was the adequacy of the company's disclosure of its accounting methods in its prospectus. There, the court found that the prospectus's "initial explanatory note concisely yet accurately defines . . . [and explains the accounting strategy, which] is again called to the reader's attention in the passage found in the text dealing with [one of the relevant assets]." 618 F.2d at 210. The prominence of the disclosure within the prospectus in *Greenapple* distinguishes *Greenapple* from this case. Here, the alleged cautionary disclosures are found not in a place that attracts the reader's attention, but rather are found in the annexes, amendments and exhibits to the Registration Statement. The court in *Miller* dismissed plaintiffs' § 11 claim for failure to state a claim based on

23

the complaint's lack of specificity as to the allegedly misleading statements. 473 F. Supp. 2d at 586. As we held in *Flag III*, plaintiffs have sufficiently stated a claim against defendants and, therefore, *Miller* is not relevant to the current motion for summary judgment.

Defendants also claim that it would be unreasonable to hold them liable for failing to disclose the underlying facts relevant to the presales because such disclosure would be unnecessarily detailed. We recognize that compliance with the Securities Act does not require issuers to bury investors "in an avalanche of trivial information," *Basic, Inc.*, 485 U.S. at 231 (internal quotation marks and citation omitted), however, "[w]here a company chooses to make a disclosure, it has a duty to make it complete and accurate." *Nanopierce Technologies, Inc. v. Southridge Capital Mgmt.*, 2008 WL 250553 at *8 (S.D.N.Y. Jan. 29, 2008) (internal quotation marks and citation omitted). A reasonable trier of fact could find that defendants did not meet their obligation to include in Flag's Prospectus and Registration Statement any information "necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a), and, therefore, this Court cannot resolve this case on a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment (Doc. #190) is denied in its entirety.

SO ORDERED.

Dated: White Plains, New York
       March 23, 2009

_William C. Conner_
Sr. United States District Judge

24