```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   11|8|10
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE FLAG TELECOM HOLDINGS, LTD. SECURITIES LITIGATION | : : : : | Master File No. 02-CV-3400 (CM) (PED) |
| THIS DOCUMENT RELATES TO:  All Actions | : : : : | |

# DECISION AND ORDER APPROVING THE SETTLEMENT, CERTIFYING THE CLASS FOR SETTLEMENT PURPOSES, APPROVING THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND, AND AWARDING ATTORNEYS' FEES

McMahon, J.:

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs and Class

Representatives Peter T. Loftin and Joseph Coughlin (collectively, "Lead Plaintiffs" or the

"Class Representatives") have moved for an order granting:  (1) final approval of the proposed

settlement of this action (the "Action") against Citigroup Global Markets, Inc. ("CGMI") and

seven former officers and directors (the "Individual Defendants")[1] of FLAG Telecom Holdings,

Limited ("FLAG")[2] (collectively, with CGMI, "Defendants") for $24.4 million in cash; (2) final

approval of the proposed Plan of Allocation of the settlement proceeds; (3) an award of

attorneys' fees and reimbursement of counsels' expenses incurred in connection with the

---

[1] The seven individual defendants are Andres Bande, Edward McCormack, Edward McQuaid, Philip Seskin, Daniel Petri, Dr. Lim Lek Suan and Larry Bautista.

[2] Former Defendant/non-party FLAG filed a Chapter 11 bankruptcy petition on April 12, 2002. FLAG emerged from its Chapter 11 proceeding on October 9, 2002, with FLAG Telecom Group Limited ("FTGL") becoming its successor.  In late 2003, FTGL was purchased by Reliance Gateway Net Limited, a subsidiary of Reliance Communications Limited.

prosecution and settlement of the Action; and (4) an award to Lead Plaintiffs for their services in prosecuting the Action.  The motion is not opposed by defendants.

## I.  PRELIMINARY STATEMENT

This Settlement is the culmination of more than eight years of intense, complex and unremitting litigation.  The claims and defenses, which center on allegations of materially false statements made by Defendants in a scheme to artificially inflate the value of FLAG's common stock, were sharply disputed and aggressively litigated by all parties.  Despite the long pendency of this case, it would be a mistake to presume that the pace of the litigation was, at any time, "leisurely."  A detailed chronology of the case, attached as Exhibit A to the moving Declaration of Brad N. Friedman, demonstrates that significant activity occurred throughout the entire eight year period.  The major judicial proceedings — which included two motions to dismiss, a motion for judgment on the pleadings, a motion for partial summary judgment, numerous discovery motions, a petition for a Writ of Mandamus, class certification and the appeal of class certification to the Second Circuit, as well as significant litigation in the District Court for the District of Columbia and in the High Court of Justice in England — represent just a small fraction of the nearly-constant activity in the case.

Discovery and discovery-related disputes required massive time and effort:  Plaintiffs reviewed more than 2.4 million pages of documents produced by Defendants; analyzed privilege logs with more than 9,000 entries; issued document requests by subpoena or Hague Request to over fifty (50) non-parties, including companies in France and England, and received nearly 300,000 pages of documents in response; and conducted sixteen (16) fact depositions, including seven taken in Europe pursuant to Hague Convention requests.  Each of three proposed Class Representatives, as well as Plaintiffs' expert, were deposed by the Defendants.  Frequent and protracted discovery disputes resulted in hundreds of letters and emails among the parties, and

multiple written opinions from multiple jurisdictions in the U.S., and in London.

Settlement negotiations in this case were extraordinarily complicated due, among other reasons, to a Directors and Officers Insurance policy involving twenty-two insurance carriers on eight separate layers of coverage. Negotiations were further complicated by parallel litigation,[3] which also had to be settled for the Individual Defendants to achieve total peace. The Settlement eventually was achieved with the assistance of the Honorable Daniel Weinstein, a retired California Superior Court Judge, after three full-day mediation sessions that were preceded by extensive written submissions from the parties on both liability and damage issues. Along the way, Plaintiffs also mediated a division of any recovery with the *Rahl* plaintiffs, in a mediation overseen by the Honorable Nicholas H. Politan, a retired Judge from the U.S. District Court for the District of New Jersey. Ultimately, all parties, including the *Rahl* plaintiffs, agreed to Judge Weinstein's "Mediator's Proposal."

Even the drafting of the settlement documents was fiercely contested. From the time the Mediator's Proposal was signed by all parties on November 6, 2009, it took more than seven months, scores of emails, and multiple written submissions to and binding rulings by the mediator, for the parties to agree on the terms of the Stipulation and Agreement of Settlement and other settlement documents.

Members of the Class appear to agree with Lead Counsel's conclusion that the proposed Settlement is fair, reasonable and adequate and that the requested fee is fair and reasonable. Pursuant to the Court's Preliminary Order, as of August 31, 2010, over 43,450 copies of the Notice have been mailed to Class Members or their nominees. (Fishbein Aff., ¶ 8.) In addition, a Summary Notice was published in the national editions of The Wall Street Journal and over the

---

[3] Rahl v. Bande, C.A. No. 04-CV-1019 (CM) (PED) ("*Rahl*").

National Circuit of *Business Wire* on July 21, 2010. (Andrejkovics Aff., ¶ 2.) The Notice informed potential Class Members of their right to object or request exclusion from the Class by September 22, 2010. No one has filed an objection to any aspect of the Settlement, including counsel's request for attorneys' fees and reimbursement of expenses, and no member of the Class has requested exclusion from the Class.

## II. FACTUAL BACKGROUND

At all times relevant to this Action, FLAG functioned as a global telecommunications network and services provider, offering a range of products and services to international telecommunications carriers, application service providers and Internet service providers. FLAG offered its shares to the general public in an initial public offering ("IPO") that commenced on February 11, 2000 and closed on February 16, 2000, during which FLAG sold 27,963,980 common shares at $24.00 per share and pre-IPO shareholders sold 8,436,320 shares at that price for total net proceeds to the company of approximately $634.6 million.

FLAG stated in its IPO Prospectus, which was incorporated into the Registration Statement filed with the SEC, that its goal was to become "the leading global carriers' carrier by offering a wide range of cost-effective capacity use options and wholesale products and services across our global network." To further that goal, FLAG was constructing the FLAG Atlantic cable system (the "FA-1 system"), a 50/50 joint venture with GTS TransAtlantic Carrier Services Ltd. ("GTS"), which would connect London and Paris to New York and have a potential capacity of fifteen times the maximum of the most advanced cable system in service on the Atlantic at that time. FLAG's IPO prospectus stated, among other things, that FLAG intended to finance the construction of the FA-1 system with $600 million in bank financing and presale

4

capacity commitments in excess of $750 million.[4]

Plaintiffs allege that, in FLAG's IPO Prospectus and, indeed, throughout the Class Period, the market was misled about the source and nature of FLAG's presales relating to the FA-1 system, the demand for FLAG's telecommunications bandwidth, the value of FLAG's assets, and FLAG's profitability. Plaintiffs claim that FLAG's IPO Prospectus was misleading and omissive because, among other things, a substantial portion of the supposed $750 million in presales were "at cost" — including $200 million to FLAG's co-venture partner, GTS. Plaintiffs allege that these "at cost" sales were mere financing facilities rather than true presales and, therefore, were not true indicators of profit or demand on the FA-1 system. Plaintiffs also allege that the motivating factor behind the "at cost" presales was to satisfy bank covenants so that FLAG could obtain financing to build the FA-1 system. Plaintiffs claim that, in turn, the motivating factor for FLAG's construction of the FA-1 system was to create a positive story and, therefore, favorable conditions for an IPO of FLAG's common stock, notwithstanding the failure of FLAG's previously existing cable system and FLAG management's substantial doubts about FLAG and FA-1's future prospects.

Plaintiffs also contend that certain Defendants (1) artificially and fraudulently inflated FLAG's reported revenues and EBITDA during fiscal years 2000 and 2001 by causing FLAG to enter into reciprocal "swap" sales with its competitors (such as Qwest and Global Crossing), which did not need the capacity, and then immediately booking the revenue from those sales while amortizing the cost over time; (2) failed to record a substantial impairment of FLAG's long-lived assets in a timely fashion; and (3) made false and misleading statements about the

---

[4] In telecom industry parlance, "presales" are capacity sales made on a system prior to the date the system is put into service.

5

demand in the marketplace for FLAG's products and services between April 24, 2001 and November 6, 2001.

Plaintiffs' claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "'33 Act claims") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (the "'34 Act claims").

Defendants contend that Plaintiffs' allegations are untrue and without any factual support and that Defendants made no false or misleading or omissive statements.

Two years after the IPO, on February 13, 2002, FLAG announced that "approximately 14% of GAAP revenues for the full year 2001 was associated with reciprocal transactions entered into with other telecommunications companies and service providers" and that FLAG anticipated that, if business conditions did not improve, the company would run out of cash sometime in 2003 unless it was able to obtain cash from another source. Following this announcement, the market price of FLAG common stock, which had traded as high as $41 per share during the Class Period, declined by 46% from its February 12, 2002 closing price, to a closing price of $0.36 per share on February 13, 2002, on trading volume more than 10 times its daily average.

## III.  HISTORY OF THE LITIGATION

### A.      Plaintiffs' Investigation, the Initial Complaint, and the Appointment of   Lead Counsel

Beginning in early 2002, Plaintiffs conducted extensive legal and factual investigations into the facts ultimately alleged in the initial complaint. This investigation and research included, *inter alia*: collecting and analyzing FLAG's financial statements and other public statements; assembling and reviewing a comprehensive collection of analyst reports, SEC filings and major financial news service reports on FLAG and the telecom industry from a variety of

sources; consulting with Lead Counsels' in-house forensic accounting experts and analyzing the relevant provisions of GAAP and related commentary; and extensively researching the applicable law.

As a direct result of Plaintiffs' investigatory efforts, the initial complaint on behalf of plaintiff Peter T. Loftin was filed on May 1, 2002. On October 18, 2002, the Honorable William C. Conner consolidated several related actions under the caption above and appointed Mr. Loftin as Lead Plaintiff and Milberg LLP, f/k/a Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg"), as Lead Counsel.

Plaintiffs thereafter began work on a Consolidated Amended Complaint. Lead Counsel's in-house investigative unit, working with outside investigators both in the United States and in England, identified, located and interviewed more than thirty potential witnesses, six of whom became confidential sources who provided information set forth in the Complaint. In addition, Plaintiffs retained and consulted extensively with damages expert Dr. Scott Hakala. Plaintiffs filed a Consolidated Amended Complaint on March 20, 2003.

Lead Plaintiff and eventual Class Representative Peter Loftin played a central role during this period, devoting many days to assisting the research and development of Plaintiffs' claims. Mr. Loftin, who lost more than $24 million on his FLAG investment, was particularly instrumental in shaping Plaintiffs' claims against former defendant Verizon Communications, Inc. ("Verizon") and even contributed draft allegations for the complaint.

On November 19, 2003, J. Andrew Rahl, as Trustee of the Flag Litigation Trust (the "Trustee"), filed the *Rahl* action in State Court in New York against some of the same defendants as this Action, and others. The *Rahl* Defendants removed that action to this Court, where it was assigned to Judge Conner as a related case. Plaintiffs' Lead Counsel and Trustee's

7

counsel in *Rahl* thereafter entered into an informal joint prosecution agreement.

**B.    The Amended and Second Amended Complaint and the Motions
to Dismiss the Second Amended Complaint**

Plaintiffs filed a 76-page, 226-paragraph Corrected Consolidated Amended Complaint on

April 15, 2003, which three different sets of law firms (Shearman & Sterling for the Individual

Defendants and former defendant FLAG; Milbank Tweed for CGMI; and Kirkland & Ellis for

Verizon) moved and filed separate briefs against.  Plaintiffs filed a Second Consolidated

Amended Complaint (the "2CAC") that made a technical correction to the name of the defendant

FLAG entity (from FTGL to FLAG), on December 1, 2003, and the prior briefing was deemed

directed towards that pleading.  In their various briefs, the then-defendants argued that (1) the

challenged statements in the Registration Statement were neither false nor misleading; (2)

Plaintiffs failed to allege facts to establish that the Defendants knew, but failed to disclose,

information they had a legal duty to disclose; (3) the challenged statements regarding market

demand and bandwidth pricing made during the Class Period were neither false nor misleading;

and (4) the allegations of GAAP violations relating to allegedly improper swap transactions and

the failure to timely write down assets were inaccurate and/or insufficiently specific and/or

vitiated by the fact that the challenged transactions had been reviewed by outside auditors.

In a forty-three page decision issued on February 25, 2004, the Court dismissed the

2CAC without prejudice.[5]

**C.    The Third Amended Complaint and the Motions to Dismiss That
Complaint**

Pursuant to the Court's Order, Plaintiffs then filed a 109-page, 299-paragraph Third

Consolidated Amended Complaint ("3CAC"), on April 14, 2004.  In response to the Court's

---

[5] In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249 (S.D.N.Y. 2004).

concerns expressed in its February 25, 2004 decision about standing under Section 12(a)(2) of

the '33 Act, in addition to Peter T. Loftin, the 3CAC included as an additional plaintiff Norman

H. Hunter, who purchased 200 FLAG shares in FLAG's IPO. Mr. Hunter sold those shares prior

to the end of the Class Period. Joseph Coughlin, who purchased shares traceable to the IPO in

February 2000 and additional shares in February 2001, and who held his shares throughout the

Class Period, moved to intervene as an additional plaintiff and proposed class representative on

February 11, 2005.

The 3CAC contained a plethora of new facts to support Plaintiffs' claims. On June 23,

2004, the Individual Defendants and FLAG moved to dismiss the 3CAC, renewing their claims

regarding the inadequacy of Plaintiffs' allegations of misleading statements and omissions and,

in addition, asserting that Hunter's claims were time-barred because of his late entry into the

case. Verizon and CGMI, separately, moved to dismiss as well.

After extensive briefing, the Court issued a sixty-five page decision on January 12, 2005,

denying in part and granting in part the motions to dismiss.[6] The Court held that Plaintiffs had

not pled facts demonstrating that the statements regarding demand in FLAG's prospectus were

false as of the time of the IPO; however, the Court held that Plaintiffs *had* "alleged facts

sufficient to demonstrate that the Prospectus contained a material misstatement or omission in

connection with the Alcatel Sales Agreement," an agreement by which FLAG had (allegedly)

fraudulently inflated the amount of its FA-1 presales.[7] The Court also held that the 3CAC

included allegations sufficient to sustain Plaintiffs' claims regarding: (1) improper accounting

related to FLAG's swap transactions; (2) FLAG's failure to write down the value of its assets in

---

[6] In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429 (S.D.N.Y. 2005).

[7] Id. at 451.

9

a timely manner; and (3) misstatements concerning demand and the optimistic outlook for FA-1 made by Bande and McCormack between April 1, 2001 and the end of the Class Period. The Court also held that the allegations in the 3CAC raised the requisite strong inference of *scienter* required for the '34 Act claims against Bande, McCormack and Bautista, but not Evans.

The Court upheld Plaintiffs' claims that FLAG's financial results issued between June 23, 2000 and February 13, 2002 were materially false or misleading when issued because FLAG had entered into improper swap transactions to artificially inflate its revenues. In this regard, the Court specifically cited supporting statements Lead Counsel had obtained from confidential sources developed during its investigation. The Court further held that Hunter's claims had been tolled by the filing of Plaintiffs' May 2002 complaint and, thus, were timely raised in the 3CAC.

Plaintiffs' '33 Act claims against defendants Bautista and Evans were dismissed because they had not signed the Registration Statement and, despite "a host of new allegations" in the 3CAC regarding Verizon's alleged status as a control person of FLAG and use of FLAG as a corporate piggy bank, the Court again dismissed Plaintiffs' claims against Verizon.[8] Plaintiffs' claims against FLAG and Evans were dismissed with prejudice and the claims against Verizon were dismissed without prejudice. The motions to dismiss by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan, and Salomon Smith Barney, Inc. n/k/a CGMI, were denied.

### D.   Motion for Judgment on the Pleadings

On June 23, 2005, CGMI moved to dismiss Plaintiffs' Securities Act claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, based on an affirmative defense of negative causation. CGMI also asserted that Plaintiffs' claims were barred by the statute of limitations. On January 23, 2006, the Court denied Defendants' motion in its entirety, holding that (1)

---

[8] Id. at 457.

Defendants had failed to establish "that the decline [in FLAG's stock price] was not due, at least

in part, to the alleged misrepresentations concerning pre-sales in Flag's Prospectus" and (2) that

the new allegations in the 3CAC arose from the same conduct charged in the May 2002

complaint and were, therefore, not time-barred.[9]

### E.   Motion for Class Certification

On February 11, 2005, Plaintiffs moved to certify a class and also moved to have Joseph

Coughlin, who purchased shares traceable to the IPO in February 2000 and additional shares in

February 2001, intervene as an additional plaintiff and proposed Class Representative.

Defendants aggressively opposed this motion, filing a fifty-page brief and a declaration with

more than 1,850 pages of exhibits.

Defendants also challenged the adequacy of the named Plaintiffs to represent the class,

claiming that the Plaintiffs were insufficiently engaged in the management of the case and, in

particular, were not sufficiently concerned with the then-pending indictment of Lead Counsel

and its potential consequences, although Defendants themselves said they did "not [challenge]

the competence or adequacy" of Lead Counsel.[10]

Plaintiffs responded with a twenty-page reply brief refuting Defendants' contentions,

accompanied by a sworn Declaration from one of Plaintiffs' previously confidential sources

(FLAG's former Vice President of Sales for North America); a sworn Declaration from damages

expert Dr. Scott Hakala (eighty-five pages with exhibits); and a sworn Declaration of Lead

Counsel (491 pages with exhibits).  Defendants submitted a 256-page sur-reply (including

---

[9]  In re Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377 (S.D.N.Y. 2006).

[10] Defendants' Joint Memorandum of Law In Opposition to Plaintiffs' Motion for Class
Certification, at 22 n.65.

exhibits). Plaintiffs filed a twenty-five page response to Defendants' sur-reply. On September 4, 2007, the District Court issued a fifty-page decision granting Plaintiffs' motion for class certification. The Court included in-and-out traders in the class because, "in light of Hakala's affidavit . . . it is conceivable" that the in-and-out purchasers may be able to prove loss causation based on events prior to the end of the Class Period.[11] The Court appointed Peter T. Loftin, Norman H. Hunter, and Joseph Coughlin as the Class Representatives, and appointed Milberg as Class Counsel.

## F. Discovery and Discovery Disputes

Discovery in this case was, itself, a multi-front war with battles frequently occurring simultaneously on two continents. Defendants opposed or objected to nearly every discovery request. Productions were often delayed, at least in part because documents, and especially critical accounting documents, were resident on difficult-to-access computer systems owned by overseas non-party FTGL. Disputes over discovery were frequently the subject of letters to the Court, resulting in numerous court appearances, multiple written Court decisions, a petition (by the Individual Defendants) for a Writ of Mandamus to the Court of Appeals, and thousands of pages of briefs and correspondence among the parties.

Plaintiffs have, since 2005, obtained approximately 2,391,600 pages of documents from the Individual Defendants, including approximately 2,381,800 pages of documents from FTGL that were produced by Defendant McCormack pursuant to an unusual court Order. In addition, Plaintiffs ultimately received 39,425 pages of accounting documents generated from FTGL's accounting system under an agreement with the Individual Defendants pursuant to which a third-party vendor generated reports and Plaintiffs (with the *Rahl* Trustee) paid one-half of the costs.

---

[11] Id. at 167.

12

Plaintiffs also obtained 37,725 pages of documents from CGMI and another 268,500 pages of documents from more than fifty (50) non-parties to whom Plaintiffs issued subpoenas and/or the Court issued Hague Convention requests in England and France.

Plaintiffs deposed sixteen witnesses, six of whom were deposed overseas pursuant to Requests for International Judicial Assistance Pursuant to the Hague Convention. At the time of the Settlement, eight additional Hague Convention requests had been issued by the Court and more overseas depositions had been scheduled.

In connection with class certification, the proposed Class Representatives, including Norman Hunter, were deposed and produced over 4,000 pages of documents. Defendants also deposed and obtained documents from Plaintiffs' damages expert, Dr. Scott Hakala.

At the time of the Settlement, Plaintiffs had issued Plaintiffs' Notice of Deposition to CGMI pursuant to Fed. R. Civ. P. 30(b)(6); Plaintiffs' Second Set of Supplemental Interrogatories to CGMI and Request for Production of Documents; and Plaintiffs' Corrected First Set of Requests for Admission to CGMI.

The parties to this Action and the *Rahl* litigation entered into a number of stipulations governing the conduct of discovery. While these stipulations greatly enhanced the efficiency of discovery for all parties, and permitted the plaintiffs in the two litigations each to access the discovery obtained by the other, the process of negotiating and drafting the stipulations was complex and extremely time-consuming.

It is totally unnecessary to recount here the massive amount of discovery litigation (and concomitant sanctions litigation) in which the parties engaged once discovery finally commenced (due to the PSLRA stay, discovery did not begin until 2005!). Suffice it to say that the parties are still unable to read each others' descriptions of their many discovery battles

without having war break out anew. Nothing between the parties came easily.

Plaintiffs' efforts to obtain discovery from non-parties also required huge investments of time and effort. As mentioned above, Plaintiffs issued subpoenas and/or the Court issued Hague Convention requests to more than fifty (50) non-parties. Several of those parties resisted discovery, necessitating collateral litigation. There was litigation between plaintiffs and the law firm of Gibson, Dunn & Crutcher, which previously represented FLAG in certain matters and which received a subpoena to produce documents in this case. Multiple hearings relating to discovery in this matter were held by the High Court of Justice in London, which required Plaintiffs to retain a Barrister in addition to their Solicitor. There were also interlocutory appeals relating to third party discovery in the Second Circuit.

### G. The Motions for Summary Judgment and the Operative Complaint

On June 25, 2007, in response to the Individual Defendants' request for permission to file a motion for partial summary judgment dismissing Plaintiffs' '33 Act claims in their entirety, Plaintiffs moved for leave to amend the 3CAC to further detail their '33 Act claims. That motion was granted. Plaintiffs filed the Fourth Consolidated Amended Complaint on October 15, 2007. The final and operative complaint, the Corrected Fourth Consolidated Amended Complaint (the "Complaint"), was filed on January 10, 2008.[12]

After the completion of further discovery targeted specifically at the more detailed '33 Act allegations, on May 13, 2008, both sets of remaining Defendants (the Individual Defendants and CGMI) filed a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking summary judgment on Plaintiffs' '33 Act claims. Defendants asserted in their motion that the Registration Statement was not false or misleading because:

---

[12] The Correction removed vestigal references to Verizon as a defendant.

14

(i)     FLAG had approximately $774 million in FA-1 presales at the time of the IPO
         and, therefore, the challenged statement at issue — that FLAG had "presales in
         excess of $750 million" — was true;

(ii)    the challenged statement could not have misled potential investors about market
         demand because the statement was in a section of the Registration Statement
         dealing with financing, not demand;

(iii)   even if a reasonable investor could have understood the challenged statements to
         be about demand for capacity on the FA-1 system, cautionary language in the
         Registration Statement about future demand for FLAG's products was sufficient
         to make the Registration Statement on the whole not misleading; and

(iv)    the specific presales transactions challenged by Plaintiffs were legitimate and the
         relevant terms of the transactions were disclosed in the Registration Statement.

Collectively, the briefing on this motion included over 175 pages of legal memoranda and

over 3,300 pages of declarations and appendices.

On March 23, 2009, the Court issued a twenty-three page opinion denying Defendants'

motion in its entirety.[13]

## H.    The Rule 23(f) Appeal of Class Certification

On September 19, 2007, Defendants each filed a petition pursuant to Rule 23(f) of the

Federal Rules of Civil Procedure seeking interlocutory review of the Court's class certification

decision. The Second Circuit granted Defendants' Rule 23(f) petitions on December 12, 2007.

On July 22, 2009, the Second Circuit affirmed virtually all of the Court's class

certification Order, rejecting all but one of the Defendants' arguments. However, the Second

Circuit agreed with Defendants that "as a matter of law" there was insufficient evidence of loss

causation prior to the last day of the Class Period for in-and-out traders to remain in the Class.

The Court of Appeals therefore vacated the Court's class certification Order with respect to those

Class Members who sold their FLAG common stock prior to February 13, 2002, and ruled that

---

[13] In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311 (S.D.N.Y. 2009).

Norman H. Hunter, who sold all of his shares before the end of the Class Period, could not serve as a Class Representative.  Unfortunately for Plaintiffs, this decision dramatically reduced the total potential recovery in this case, from more than $360 million to approximately $14.2 million.[14]

On August 5, 2009, Plaintiffs filed a petition pursuant to Rules 35 and 40 of the Federal Rules of Appellate Procedure seeking rehearing of the appeal and/or rehearing *en banc*.  By Order dated October 6, 2009, the Second Circuit Court of Appeals denied Plaintiffs' petition for rehearing and/or rehearing *en banc*.

### I.      Judge Conner's Death and the September 2009 Status Conference

In early July 2009, the parties learned that the Judge who had so ably presided over this matter since its inception, Judge Conner, had died.  Shortly thereafter the case was re-assigned, and on August 7, 2009, the parties were advised that the Court would hold a status conference on September 17, 2009.  At that status conference, the Court informed the parties that it would not be overly sympathetic to resolving prior to trial yet another defense motion for partial summary judgment, this time on the '34 Act claims, because a trial was already a near certainty in light of the denial of the motion for summary judgment on the '33 Act claims.  The Court also informed the parties that it thought the motion for rehearing in the Second Circuit (which was then pending) was unlikely to be granted, and that if it was in fact denied, the Court would not be sympathetic to a renewed motion, based on additional evidence, to certify a class of in-and-out traders.  The Court set a schedule to complete discovery and advised the parties that it expected

---

[14] Prior to the Second Circuit's decision, Plaintiffs' damage expert, Dr. Scott Hakala, calculated that the potential damages in this case were in the range of $362.3 million to $465.5 million, depending on whether one used the economic loss method or the investment loss method of calculating damages, and whether the date of the first significant corrective disclosure is considered to be April 2, 2001 or June 18, 2001.

the case to be resolved — whether by settlement or trial — within the year.

## IV. HISTORY OF THE SETTLEMENT NEGOTIATIONS

In a case of this complexity and magnitude, one expects to encounter certain obstacles to settlement. In this case, settlement negotiations were exponentially more complicated than usual due to the Byzantine structure of the Directors and Officers ("D&O") Insurance policy covering the Individual Defendants, disputes between the two sets of defendants and among the insurance carriers and the Defendants, and the existence of the parallel *Rahl* action.

The $250 million D&O policy is comprised of one primary and seven excess coverage layers, with multiple carriers sharing each layer. For example, the second excess layer includes five carriers. In all, there are 22 different carriers, with several appearing in more than one layer.[15] According to the terms of the policy, the carriers in any particular layer are not obligated to make any payment unless and until all the coverage layers below are exhausted. This coverage structure results in a situation where any carrier that would be required to pay into a possible settlement can effectively veto the settlement even though that veto may expose carriers on higher layers to greatly increased liability; and, unless the vetoing carrier itself appears on a higher layer, it has no incentive to accept the settlement. Further complicating the situation, certain carriers in the insurance tower, at various times, threatened to and/or did disclaim coverage of the '33 Act claims[16] and/or coverage of CGMI.

---

[15] The first layer is $20 million (two carriers share 50/50); the second layer is $30 million after the first $20 million is exhausted (two carriers share 50/50); the third layer is $50 million after the prior $50 million is exhausted (five carriers have 20% each); the fourth layer is $50 million after the prior $100 million is exhausted (one carrier has 82.16%, plus two others); the fifth layer is $25 million after the prior $150 million is exhausted (one is 40% and three others are 20% each); and the sixth through eighth layers are $25 million each (each is a different single carrier).

[16] Astoundingly, certain excess insurance policies in the tower did not "follow form."

17

The parties' long-running dispute over loss causation also posed a very significant obstacle to settlement.  In addition to raising the issue in their motions to dismiss, motion for judgment on the pleadings, summary judgment motion, opposition to class certification and in their appeal of the class certification decision, Defendants continually asserted causation as a defense throughout the settlement negotiations, maintaining that damages were only a small fraction of those claimed by Plaintiffs.

### A.    Judge Weinstein Presides Over the First Mediation Session Between Plaintiffs and the Individual Defendants

On October 17, 2007, Plaintiffs' Lead Counsel (with the assistance of Mr. Loftin's personal in-house counsel), counsel for the Individual Defendants (with the assistance of defendant McCormack), and counsel for several of the insurance carriers, conducted a full-day mediation session before retired California Superior Court Judge Daniel Weinstein of JAMS.[17] Formal written mediation statements were submitted by both sides in advance of the mediation. At the Mediator's request, both sides also submitted a supplemental mediation statement on the issue of loss causation.  At the beginning of the mediation counsel for both sides, as well as Mr. McCormack, made oral presentations.  At the conclusion of the session Plaintiffs made a settlement demand to which the Individual Defendants did not respond, and the mediation ended without success.

### B.    Periodic Efforts Continue Over the Next Year and a Half

Although formal mediation did not resume until June 2009, Judge Weinstein periodically kept in contact with both sides, and even occasionally met in person with several of the insurance carriers to discuss this case — including at least once for breakfast in the summer of 2008.

---

[17] CGMI and plaintiff's counsel in *Rahl* were not part of the initial mediation efforts.

18

However, Lead Counsel refused to attend any further meetings absent a commitment that such a meeting would result in a meaningful response to the outstanding settlement. As the insurance carriers would not make such a commitment, no meeting occurred.

In addition, Lead Counsel exchanged a few telephone calls with counsel for CGMI, to see whether CGMI had any interest in discussing settlement. Counsel for CGMI had no interest at that time in mediation, but was willing to consider a direct negotiation if the parties were in the same financial ballpark. It quickly became clear that the parties were not in the same ballpark, and so no such negotiations occurred.

## C.    Judge Weinstein Presides Over the Second Mediation Session Between Plaintiffs and the Individual Defendants

By Spring 2009, the insurance carriers finally agreed to make a meaningful response to Lead Counsel's outstanding settlement demand, and on June 2, 2009, Plaintiffs' Lead Counsel (again with the assistance of Mr. Loftin's in-house counsel), counsel for the Individual Defendants, and counsel for several of the insurance carriers (including counsel for certain additional insurance carriers who had not attended the prior mediation session), renewed their mediation efforts before Judge Weinstein. By this time, the primary insurance layer was entirely or almost entirely exhausted by defense costs. Once again, however, the mediation was unsuccessful.

## D.    Judge Politan Presides Over a Mediation Session Between Plaintiffs and the Plaintiff in *Rahl*

Lead Counsel and plaintiff's counsel in *Rahl* agreed that, for a variety of reasons, it would make sense if the plaintiffs in the two competing actions could agree (subject to the later approval by this Court now being sought) upon an allocation between them of any recovery in both cases. Accordingly, on June 24, 2009, Plaintiffs' Lead Counsel and counsel for the Trustee

in *Rahl* conducted a full-day mediation session before retired United States District Court Judge Nicholas H. Politan, to see whether these two sets of plaintiffs could agree upon a division between them of any future recovery. This mediation resulted in an agreement that the Class would receive 70% of any recovery from the Individual Defendants, plus 100% of any recovery from CGMI. Certain document production issues were also mediated and resolved as between the Trustee and the Class.

In retrospect, the importance of this agreement cannot be overstated. At the time — June 2009 — the Second Circuit had not yet issued its ruling on loss causation. Had Lead Plaintiffs won the loss causation issue in the Circuit (as Lead Counsel reasonably believed they would) the 70-30 split with *Rahl* might well have turned out to be a mildly bad deal, or at least a neutral deal, for the Class. *However*, by "hedging" against the possibility of a bad result in the Circuit, Plaintiffs ultimately were able to achieve *more* than a full recovery in their negotiations with the Defendants. This agreement also removed a significant complication in connection with achieving a global settlement.

## E. Judge Weinstein Presides Over a Third Mediation Session, This Time Among the Plaintiffs in Both Cases, the Individual Defendants, and CGMI

The mediation before Judge Weinstein finally convened for the third time on October 29, 2009, this time with the addition of counsel for the Trustee, as well as counsel for CGMI, who learned about the planned mediation shortly before-hand and requested (and was granted) permission to attend. The parties did not reach agreement during this session. However, this session did eventually result in a "Mediator's Proposal" that was accepted by all parties on November 6, 2009. As a result of this proposal, and Plaintiffs' earlier agreement with the Trustee, Plaintiffs have agreed to settle this action for 70% of the $34 million in cash being paid

20

on the Individual Defendants' behalf to settle this action and *Rahl*, plus $600,000 in cash being paid by CGMI (all of which is going to the Class in this Action). The total settlement consideration to the Class in this Action is $24.4 million.

F.   **"Litigation" Ensues Before Judge Weinstein Over the Terms of the Final Settlement Agreement**

Even the signing of the Mediator's Proposal did not end the legal battle. Over a period of more than seven months after the Mediator's Proposal was signed, the parties exchanged multiple drafts of the Stipulation and Agreement of Settlement, Notice of Pendency and other documents, but were not able to resolve all outstanding issues. Fortunately, however, as part of the Mediator's Proposal to which all parties agreed, Judge Weinstein retained "binding authority" to resolve any disputes in connection with finalizing the settlement papers.

In February and March 2010, numerous issues were submitted to Judge Weinstein for decision pursuant this binding authority, and multiple responses and replies were submitted by Plaintiffs and the Individual Defendants. Additional disputes, as between the insurance carriers and the Individual Defendants, were also submitted to Judge Weinstein for resolution, thereby causing further delay. The Stipulation and Agreement of Settlement was finally executed on June 21, 2010.

V.   **THE ISSUANCE OF NOTICE AND THE REACTION OF THE CLASS TO THE PROPOSED SETTLEMENT**

Subsequent to the Settlement, Lead Plaintiffs retained a claims administrator on behalf of the Class (the "Claims Administrator"). The Claims Administrator was chosen after a competitive bidding process and extensive negotiations thereafter to significantly reduce third party costs, such as broker nominee charges typically incurred during securities class action settlement administrations.

After the parties submitted documentation requesting preliminary approval of the Settlement, this Court entered an Order on June 23, 2010, preliminarily approving the Settlement embodied in the Stipulation (the "Preliminary Approval Order"). The Preliminary Approval Order: (1) approved a form of Notice; (2) approved the form of publication notice; (3) ordered that any Class members wishing to exclude themselves from the Class do so by letters postmarked no later than September 22, 2010; (4) ordered that any Class members wishing to object to the Settlement file their papers by September 22, 2010; and (5) ordered a fairness hearing to take place at 2 p.m. on October 29, 2010. The Court also approved the Claims Administrator in the Preliminary Approval Order.

In accordance with the Preliminary Approval Order, on July 16, 2010, Lead Counsel caused the Notice to be mailed to all Class members who could be identified from FLAG's stock transfer records and through the efforts of the Claims Administrator. As of August 31, 2010, a total of over 43,450 Notices were sent to potential Class members. (Fishbein Aff., ¶ 8.) Additionally, and also pursuant to the Preliminary Approval Order, on July 21, 2010, a Summary Notice was published in the national editions of The Wall Street Journal and over the National Circuit of *Business Wire*. (Andrejkovics Aff., ¶ 2.)

The Notice provided a detailed description of: (1) the Action; (2) the nature of the claims; (3) the history of the litigation; (4) the potential outcome if this Action were to proceed to trial; (5) the terms of the proposed settlement and the Plan of Allocation, including the manner in which the Settlement Fund would be divided among the Class; (6) the process and deadline for filing objections, requests for exclusion and claim forms; (7) the date, time, and place of the Court's hearing to determine the fairness of the Settlement; (8) the right of Class members to be heard at the hearing; and (9) the claims to be released. The Notice also informed the Class that

Lead Plaintiffs would apply for: (1) reimbursement of their expenses in the approximate amount of two million dollars, plus an award of attorneys' fees in the amount of 30% of the remaining balance of the Gross Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs; and (b) awards to the Lead Plaintiffs for their services in prosecuting the Action in the amounts of $100,000 for Lead Plaintiff Peter T. Loftin and $5,000 for Lead Plaintiff Joseph Coughlin.

Both the Notice and Summary Notice are available on the Internet on the websites of Lead Counsel and the Claims Administrator and at the website flagtelecomsecuritiessettlement.com.  To date, Lead Plaintiffs have paid $66,714.44 out of the Settlement Fund to cover the costs related to Settlement notice and administration.

Pursuant to the terms of the Notice and the Court's preliminary approval Order of June 23, 2010, Class Members have until September 22, 2010 to opt-out of or object to this Settlement pursuant to Fed. R. Civ. P. 23.  No Class Members have exercised their right to opt out and no Class Members have objected to the proposed Settlement.

## VI.  THE COURT GRANTS FINAL APPROVAL TO THE  PROPOSED SETTLEMENT

### A.  The Standard for Evaluating Class Action Settlements

The standard for reviewing a proposed class action settlement is whether the settlement is "fair, reasonable and adequate." In re EVCI Career Colleges Holding Corp. Sec. Litig., Nos. 05 Civ. 10240(CM) et. al., 2007 WL 2230177, at *3 (S.D.N.Y. July 27, 2007) (citing Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1027, 1079 (2d. Cir. 1995)). "A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws." EVCI, 2007 WL

23

2230177, at *4 (citing In re Sumitomo Copper Litig., 189 F.R.D. 274, 280 (S.D.N.Y. 1999));

New York & Maryland v. Nintendo of Am., 775 F. Supp. 676, 680-81 (S.D.N.Y. 1991)); accord

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005), cert. denied, 544

U.S. 1044 (2005). "There is a 'strong judicial policy in favor of settlements, particularly in the

class action context.'" In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008)

(quoting In re Paine Webber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998)). Moreover,

"'great weight' is accorded to the recommendations of counsel, who are most closely acquainted

with the facts of the underlying litigation." Maley v. Del Global Techs. Corp., 186 F. Supp. 2d

358, 366 (S.D.N.Y. 2002) (internal quotation and citation omitted).

The presumption in favor of the negotiated settlement in this case is strengthened by the

fact that settlement was reached in an extended mediation supervised by Judge Weinstein. See

In re Telik, 576 F. Supp. 2d at 576 ("Judge Weinstein's role in the settlement negotiations

strongly supports a finding that they were conducted at arm's-length and without collusion."); In

re Elan Sec. Litig., 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005) ("[T]he Court has no reason to

question that the Settlement was the product of extended 'arm's length' negotiations, including,

among other things, the two-day settlement conference before Judge Politan."); In re Interpublic

Sec. Litig., Nos. 02 Civ. 6527(DLC), 03 Civ. 1194(DLC), 2004 WL 2397190, at *7 (S.D.N.Y.

Oct. 26, 2004) (negotiations were arm's-length where, among other things, parties met with

magistrate judge and document discovery was complete).

All parties were represented throughout the Settlement negotiations by able counsel

experienced in class action and securities litigation: Plaintiffs by Brad N. Friedman of Milberg,

LLP; CGMI by Douglas Henkin of Milbank, Tweed, Hadley and McCloy; and the Individual

Defendants by Jerome Fortinsky of Shearman & Sterling. The Trustee was represented by Grant

24

& Eisenhofer.  See In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 461 (S.D.N.Y. 2004) ("Both sides have been represented well . . . .  Counsel for plaintiffs, the Settling Defendants, and STB possessed the requisite expertise to negotiate a fair settlement."); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 466, 474 (S.D.N.Y. 1998) (approving settlement where "[t]he process by which the parties reached the Proposed Settlements was arm's-length and hard fought by skilled advocates").

In sum, the Settlement was negotiated at arm's-length by sophisticated counsel before an experienced mediator, and after the completion of significant discovery.  These facts establish that the process leading to the Settlement was fair to absent Class Members.  The Court should therefore accord the strongest presumption of fairness to the Settlement in this case.

### B. The Settlement Is Fair, Reasonable and Adequate and in the Best Interests of the Class

Courts in this Circuit evaluate the fairness, adequacy and reasonableness of a class action settlement according to the "Grinnell factors:"

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.

City of Detroit v. Grinnell Corp, 495 F.2d 448, 463 (2d Cir. 1974); see also County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1323-24 (2d Cir. 1990); In re Sumitomo, 189 F.R.D. at 281.  "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"  In re Global Crossing, 225 F.R.D. at 456 (quoting Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).

25

### i.  Continued Litigation Would Be Complex and Consume
### Substantial Judicial and Private Resources

The complexity, expense and possible duration of this litigation weigh in favor of

settlement.  "[I]n evaluating the settlement of a securities class action, federal courts, including

this Court, 'have long recognized that such litigation is notably difficult and notoriously

uncertain.'"  Sumitomo, 189 F.R.D. at 281 (quoting In re Michael Milken and Assoc. Sec. Litig.,

150 F.R.D. 46, 53 (S.D.N.Y. 1993)).  Indeed, the courts recognize that "[s]ecurities class actions

are generally complex and expensive to prosecute."  In re Gilat Satellite Networks, Ltd., No. CV-

02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Thus, "[c]lass action suits readily

lend themselves to compromise because of the difficulties of proof, the uncertainties of the

outcome, and the typical length of the litigation."  In re Luxottica Group S.p.A. Litig., 233

F.R.D. 306, 310 (E.D.N.Y. 2006) (citations omitted).

Although Plaintiffs have conducted significant fact discovery, the costs and duration of

completing fact discovery, conducting expert discovery, additional motion practice, trial

preparation, the trial itself, post-trial motions, and any appeals would be substantial.  At the time

this proposed Settlement was reached, six additional overseas depositions were scheduled.  In

total, at least twelve additional depositions would have been conducted by Plaintiffs in

preparation for trial.  Expert discovery would be particularly expensive and time-consuming as

both sides would require the services of experts in the telecommunications industry in addition to

accounting and damages experts.

Finally, whatever the outcome of any eventual trial, which would likely require several

months and involve the introduction of hundreds (if not thousands) of exhibits, vigorously

contested motions and significant expenses, it is virtually certain that appeals would be taken

from any verdict.  All of the foregoing would delay the ability of the Class to recover for

26

years — assuming, of course, that Plaintiffs would ultimately be successful in proving their claims. Settlement at this juncture unequivocally results in a substantial and tangible present recovery for the Class, without any attendant risk of delay, or of continued litigation through, for example, summary judgment on the '34 Act claims, a protracted trial, and post-trial proceedings. See Hicks v. Stanley, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at \*6 (S.D.N.Y. Oct. 19, 2005) ("Further litigation would necessarily involve further costs; justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

### ii. The Reaction of the Class to the Proposed Settlement Has Been Overwhelmingly Positive

The reaction of the Class to the Settlement is a significant factor — perhaps the most significant factor — to be weighed in considering its adequacy. In re Veeco Instruments Secs. Litig. ("Veeco I"), No. 05 MDL 0165(CM), 2007 WL 4115809, at \*7 (S.D.N.Y. Nov. 7, 2007); see also Maley, 186 F. Supp. 2d at 362; In re American Bank Note Holographics, Inc., Sec. Litig., 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001).

The Class's reaction to the Settlement in this case is overwhelmingly positive. More than 43,450 Notices were mailed to Class Members or their nominees. To date, no Class Members have exercised their right to opt out and no Class Members have objected to the proposed Settlement. This is an exceptionally strong indication of the fairness of the Settlement. See Strougo v. Bassini, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (citing In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 530 (E.D. Pa. 1990) ("Both the utter absence of objections and the nominal number of shareholders who have exercised their right to opt out . . . militate strongly in favor of approval of the settlement."). The absence of objections to the Settlement supports the inference that it is fair, reasonable and adequate. See Maley, 186 F. Supp. 2d at 374.

27

### iii. Settlement Was Reached at an Advanced Stage of Litigation After Significant Discovery and Extensive Consultation with a Damages Expert

The advanced stage of this litigation and the extensive amount of discovery completed militate in favor of approval of the Settlement. As detailed above, the parties have been vigorously litigating this case for more than eight years, through multiple motions to dismiss, a motion for judgment on the pleadings, discovery and countless discovery motions, a class certification motion, a motion for partial summary judgment, and an interlocutory appeal of the Court's class certification Order. Plaintiffs have reviewed more than 2.5 million pages of documents and taken 16 depositions. Defendants have deposed each of the Class Representatives plus plaintiff Norman Hunter and Plaintiffs' damages expert. The parties conducted multiple full-day mediation sessions before Judge Weinstein (plus Plaintiffs' and the Trustee's mediation before Judge Politan) and exchanged extensive mediation statements on both liability and damages. Throughout all phases of the litigation, Lead Counsel has consulted with and received the advice of Dr. Scott Hakala, a recognized expert on the subject of damages in securities cases.

Thus, the parties reached an agreement to settle the litigation at a point when they had a well-informed understanding of the legal and factual issues surrounding the case. Having sufficient information to properly evaluate the strengths and weaknesses of their case, Lead Counsel were able to settle the litigation on terms highly favorable to the Class without the substantial risk, uncertainty, and delay of continued litigation. See Veeco I, 2007 WL 4115809, at *8 ("It is evident that Plaintiffs have a clear view of the strengths and weaknesses of their case and of the adequacy of the Settlement.") (internal quotations omitted) (citing Meijer, Inc. v. 3M, Civil Action No. 04-5871, 2006 WL 2382718, at *14 (E.D. Pa. Aug. 14, 2006) (Parties had "an adequate appreciation of the merits" of case at time settlement negotiated where Class Counsel,

28

*inter alia*, reviewed hundreds of thousands of pages of documents and depositions and consulted extensively with economic expert; and parties engaged in mediation, including exchange of mediation statements regarding merits of respective positions in order to inform and facilitate negotiations.)).

### iv.  Establishing Liability, Particularly with Respect to Defendants' *Scienter*, Involves Significant Risks

While Plaintiffs maintain that their claims against Defendants are valid, they would face significant legal challenges if this case were to continue, and there is a real risk that they would ultimately fail to establish liability.  "Courts routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear."  In re Top Tankers, Inc., Sec. Litig., No. 06 Civ. 13761(CM), 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008); see In re AOL Time Warner, Inc. Sec. & ERISA Litig., No. MDL 1500, 02 Civ. 5575(SWK), 2006 WL 903236, at *4 (S.D.N.Y. Apr. 6, 2006) ("The difficulty of establishing liability is a common risk of securities litigation."); In re Indep. Energy Holdings PLC Sec. Litig., No. 00 Civ. 6689(SAS), 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) (noting difficulty of proving *scienter*); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321-22 (2007).

In their various motions, answers to the Complaint, and during the multiple mediation sessions, the Individual Defendants have asserted that:

- the disclosures in FLAG's registration statement regarding presales were accurate and not misleading;
- the Individual Defendants' Class Period statements regarding demand were true and not misleading;
- all of FLAG's accounting for capacity sales during the Class Period was accurate and in accordance with GAAP;
- the allegedly improper "swap" transactions were legitimate business transactions and were properly accounted for;

29

- FLAG was not required to report an impairment during the Class Period; and

- Plaintiffs could not prove causation and damages.

Defendant CGMI has asserted numerous additional defenses, including negative causation and that it conducted sufficient due diligence. Had this case not settled, Defendants could be expected to gather additional evidence for each of these defenses and to assert them in a motion for summary judgment and/or at trial and, if necessary, on appeal.

The Individual Defendants have also claimed that Plaintiffs face insurmountable hurdles in proving *scienter* against the three remaining Individual Defendants on Plaintiffs' '34 Act claims. Plaintiffs believe they would ultimately prevail on this issue but acknowledge that proving *scienter* in this case would be particularly challenging in light of the following: (1) there is no evidence that any of the '34 Act Defendants exercised options on or sold FLAG stock during the Class Period; (2) the '34 Act Defendants claim to have relied in good faith on the advice of multiple sets of accountants who approved the relevant accounting decisions; and (3) the '34 Act Defendants claim their alleged misstatements were supported by contemporaneous documents and reports that, in and of themselves, negate any inference of *scienter*.

Moreover, at trial, Plaintiffs would face the additional risks posed by conflicting evidence and testimony. Since many witnesses likely would be aligned with Defendants and, as a result, would be hostile to Plaintiffs' case, Plaintiffs would be required to rely primarily on documents and expert witnesses to establish their case. The risk of establishing liability would be exacerbated by the risks inherent in all shareholder litigation, such as the unpredictability of a lengthy and complex jury trial, the risks that witnesses would suddenly become unavailable or jurors could react to the evidence in unforeseen ways, and the risks that the jury would find that Defendants reasonably believed in the propriety of their actions at the time and, consequently, Plaintiffs failed to prove *scienter*.

30

### v. Establishing Recoverable Damages, Particularly with Respect to Loss Causation, Also Involves Significant Risks

Plaintiffs also faced significant risk in proving causation and the amount of damages.

> In order to prove loss causation and damages, Lead Plaintiff would be required to prove that Defendants' alleged false and misleading statements and omissions of material fact inflated the price of [defendant's] common stock during the Class Period, and that upon the Company's disclosure of such misinformation, the price of [defendant's] common stock dropped and damaged Lead Plaintiff and the Class. Lead Plaintiff would also be required to prove the amount of artificial inflation in the price of [defendant's] common stock.

In re Top Tankers, 2008 WL 2944620, at *5. Plaintiffs anticipate that, in the absence of

settlement, Defendants would move for summary judgment on the '34 Act claims at the close of

discovery, renewing the multiple arguments made in their motions to dismiss and for judgment

on the pleadings.

The most significant risk to Plaintiffs' claim for damages was actually realized in this

case, when the Second Circuit held, as a matter of law, that there was insufficient evidence on

which in-and-out traders could establish the element of loss causation. As previously noted, this

decision probably caused a very significant reduction in Plaintiffs' recoverable damages, from

over $360 million to approximately $14.2 million. Although Plaintiffs initially considered a

motion asking that the District Court reformulate the Class to include at least some of the

individuals excluded by the Second Circuit's decision, the likelihood of success on such a

motion was slim, and the Court so advised the parties during the September 17, 2009 status

conference.

With regard to the damages remaining viable in the case, Defendants likely would

contend that actual damages, if indeed there were any at all, were far less than even $14.2

million. First, Defendants would claim that any losses suffered by the Class during the Class

period were caused not by the acts of the Individual Defendants but, rather, by the general stock

market decline and, in particular, the collapse of the telecommunications market. Second,

Defendants would argue that the decline in FLAG's stock price following its announcement on

February 13, 2002 resulted primarily from statements indicating that the company might not be

able to continue operations in 2003, not from the "corrective disclosures" related to the fraud

alleged by Plaintiffs. Finally, even if Plaintiffs prevailed on issues of liability and damage

causation, Defendants would likely present an expert to testify that the proper calculation of

damages would result in a recovery of only minimal damages at most.

Even in a less challenging case, "[c]alculation of damages is a 'complicated and uncertain

process, typically involving conflicting expert opinion' about the difference between the

purchase price and the stock's 'true' value absent the alleged fraud." Global Crossing, 225

F.R.D. at 459 (quoting Mayley, 186 F. Supp. 2d at 365). Undoubtedly, in this action,

establishing the amount of damages at trial would have resulted in a "battle of experts." The

jury's verdict with respect to damages would thus depend on its reaction to the complex

testimony of experts, a reaction that is inherently uncertain and unpredictable. See EVCI Career

College, 2007 WL 2230177, at *8 (citing In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104,

129 (S.D.N.Y.1997), aff'd, 117 F.3d 721 (2d Cir. 1997) (noting unpredictability of outcome of

battle of damage experts)).

Thus, the very substantial challenges facing Plaintiffs in their attempts to prove liability,

loss causation and damages weigh heavily in favor of approval of the proposed Settlement.

### vi. The Risk of Maintaining a Class Action Through Trial Also Weighs in Favor of Approval

In addition to the risks of establishing liability and damages, the nature of the Second

Circuit's decision was such that there remained a risk of maintaining class status through trial.

From the beginning of the case, Defendants strongly contested class certification on various

grounds. It is likely that, after the conclusion of expert discovery, Defendants would renew their

argument that conflicts among class members relating to liability and damages make class

treatment improper or, alternatively, require the certification of subclasses. The Second Circuit,

while upholding the certification of a single class including both '33 Act and '34 Act plaintiffs,

cautioned:

> [W]e do not suggest that the issue described by Defendants does not deserve the
> careful and continued attention of the district court, but merely that it does not
> inevitably lead at the present time to the decertification of the class. As the lower
> court recognized, if Plaintiffs are able to prove loss causation with respect to both
> the '33 and '34 Act claims, then it will be necessary for a jury "to determine the
> extent of harm caused by each [misstatement], and it is here that the interests of
> class members could diverge." We are confident in the lower court's wisdom and
> ability to utilize the available case management tools to see that all members of
> the class are protected, including but not limited to the authority to alter or amend
> the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses
> pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue orders
> ensuring "the fair and efficient conduct of the action."

In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 37 (2d Cir. 2009) (internal citations

omitted) (citing In re Flag, 245 F.R.D. at 160). Thus, there remained in this case the very real

risk of decertification or modification of the class at a later stage of the proceedings. See In re

NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 466, 476-77 (S.D.N.Y. 1998)

(decertification can occur if management problems arise during litigation; decertification or

reversal of certification would deprive class of any recovery).

### vii. The Ability of the Defendants to Withstand a Greater Judgment

If Plaintiffs somehow were successful in undoing the implications of the Second Circuit's

loss causation ruling, then the '34 Act Defendants would lack sufficient insurance, and

presumably would lack sufficient resources, to pay a judgment in the full amount of the claimed

damages. CGMI recently needed a well-publicized infusion of taxpayer dollars just to survive.

In any event, "the mere ability to withstand a greater judgment does not suggest the settlement is

unfair." AOL Time Warner, 2006 WL 903236, at *42. This is particularly true where, as here, the settlement appears to exceed the recoverable damages, in light of the Second Circuit's ruling.

### viii.  The Settlement is Reasonable When Viewed in Light of the Best Possible Recovery and the Risks of Continued Litigation

The last two substantive factors courts consider are the range of reasonableness of the settlement funds in light of (1) the best possible recovery and (2) litigation risks. In analyzing these last two factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case. The Court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." Grinnell, 495 F.2d at 462. Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." PaineWebber, 171 F.R.D. at 130 (quoting Milken, 150 F.R.D. at 66). Instead, "in any case there is a range of reasonableness with respect to a settlement." Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972); see Indep. Energy, 2003 WL 22244676, at *4.

Under the proposed Settlement, the Class will receive \$24.4 million, well in excess of the \$14.2 million estimated by Plaintiffs' expert to be the potential damages in light of the Second Circuit ruling excluding in-and-out traders from the Class. More aggressive methods of calculation could result in damages ranging from approximately \$25 million to approximately \$120 million.[18] Even under the most favorable, \$120 million scenario, the proposed settlement

---

[18] To achieve these results, Class Members (those who held their shares throughout the Class Period) would have to prove loss causation prior to the end of the Class Period notwithstanding the Second Circuit's holding that "as a matter of law" there is insufficient evidence of such loss causation. In addition, to obtain the most favorable damages scenario (\$120 million), Plaintiffs would need to argue that the Court should calculate damages based on the "constant percentage inflation" method, not the "constant dollar" method — *i.e.*, that artificial inflation (and,

amounts to over 20% of the potential damages, well within the "range of reasonableness." See

In re Merrill Lynch Research Rep. Sec. Litig., Nos. 02 MDL 1484(JFK), 02 Civ. 3176(JFK), 02

Civ. 7854(JFK), 02 Civ. 10021(JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007)

(settlement representing 6.25% of estimated damages found to be "at the higher end of the range

of reasonableness of recovery in class action securities litigations"); In re PaineWebber, 171

F.R.D. at 132 (recovery between 7% and 20% is "well within the range of reasonableness"); see

also In re Telik, 576 F. Supp. 2d at 580 (settlement representing 25% of recoverable damages is

"well above that in most securities class actions"); Veeco I, 2007 WL 4115809, at *11

(settlement representing 23.2% of possible recovery is "squarely within the range of

reasonableness") (internal quotations omitted).

By all measures, the proposed Settlement compares favorably with settlements reached in

other securities class actions in recent years. According to objective data recently published by

Cornerstone Research, the $24.4 million recovery here is more than three times the median

settlement ($7.4 million) in class actions reported during the period 1996 through 2008 and three

times the median settlement ($8.0 million) reported for 2009 settlements. The median settlement

in class actions securities cases was 2.9% of estimated damages for the period 2002 through

2008 and 2.3% of estimated damages in 2009. In cases with estimated damages of less than $50

million, the median settlement was 11.4% of estimated damages for the period 2002 through

---

consequently, damages) should be measured by the *percentage* by which FLAG's stock price
dropped when corrective information was revealed to the market, not simply by the *dollar
amount* by which FLAG's price dropped upon the disclosure of corrective information. While
Plaintiffs believe that each of these approaches for calculating legally compensable damages is
economically sound, and while valid legal and factual arguments exist in support of each of these
approaches, such approaches are not universally accepted and have not been accepted by all
courts. See, e.g., In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1270 (N.D. Okla. 2007)
(rejecting the "constant percentage inflation" method), aff'd, 558 F.3d 1144 (10th Cir. 2009).

2008 and 12% of estimated damages in 2009. Here, the settlement amount represents 170% of the potential damages (with damages of $14.2 million), and 20% of the maximum potential damages under the most aggressive possible approach (with damages of $120 million).

In light of these circumstances and all of the delay and uncertainty that would be inherent in continued litigation, the Settlement falls well within the range of possible recovery considered fair, reasonable and adequate.

## VII.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

A Plan of Allocation is fair and reasonable as long as it has a "reasonable, rational basis." Maley, 186 F. Supp. 2d at 367. Courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." PaineWebber, 171 F.R.D. at 133. An allocation formula need only have a reasonable and rational basis, particularly if recommended by experienced and competent counsel. Counsel's conclusion here that the Plan of Allocation is fair and reasonable is therefore entitled to great weight. American Bank Note, 127 F. Supp. 2d at 430 (approving allocation plan and according counsel's opinion "considerable weight" because there were "detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

The Plan of Allocation proposed herein has been prepared by Plaintiffs' Lead Counsel utilizing their Damages Expert's report and data concerning causation and damages. The Plan reflects the proposition that the price of FLAG common stock was artificially inflated from the beginning of the '33 Act Class Period on February 11, 2000, and at the beginning of the '34 Act Class Period on March 6, 2000, and through February 12, 2002, but that much of the artificial inflation was suddenly eliminated on February 13, 2002 when FLAG made disclosures that at least partially corrected its prior misstatements, and that any remaining artificial inflation was

36

eliminated by April 11, 2002. The Plan reflects the requirements for establishing damages promulgated by Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), and complies with the requirements of the PSLRA.

The Plan of Allocation separately allocates the Net Individual Defendants' Settlement Fund differently than the CGMI Settlement Fund, based on the fact that CGMI was only alleged to be liable under the Securities Act for the IPO, while the Individual Defendants were alleged to be liable under both the Securities Act for the IPO and under Section 10(b) of the Exchange Act for the Class Period.

The Plan provides for the distribution of the Net Individual Defendants' Settlement Fund to all Class Members on a *pro rata* basis based on a formula that takes into account the alleged artificial inflation paid on the shares of FLAG stock purchased during the entire period February 11, 2000 through February 12, 2002, that were still held at the close of trading on February 12, 2002.

The Plan separately provides for the distribution of the Net CGMI Settlement Fund to all IPO Class Members on a *pro rata* basis based on a formula that takes into account the alleged artificial inflation paid on shares of FLAG stock purchased during the IPO period February 11, 2000 through May 10, 2000, that were still held at the close of trading on February 12, 2002.

The Plan's formula subtracts the Asserted Value of the shares on the day of purchase from the purchase price actually paid to calculate the amount of artificial inflation allegedly paid, and either uses that, or a maximum of $5.08 per share, the amount by which the corrective disclosure reduced the alleged inflation, to give the Claimant a "Recognized Claim" from those shares. If the shares were sold after February 12, 2002 for more than their Asserted Value, then the amount received in excess of the Asserted Value can reduce the Recognized Claim. The Net

Individual Defendants' Settlement Fund will be distributed *pro rata* to Class Members who submit acceptable Proofs of Claim ("Authorized Claimants") based on their particular Recognized Claim as compared to the total of all Class Members' Recognized Claims. The Net CMGI Settlement Fund will be distributed *pro rata* to Authorized Claimants based on their particular IPO Recognized Claim as compared to the total of all IPO Class Members' Recognized Claims.

The Plan of Allocation is set forth in full in the Settlement Notice, and there have been no objections to the Plan.

Accordingly, the court concludes that the Plan of Allocation provides a fair and reasonable method for allocating the Net Settlement Funds among Class Members based on their relative compensable losses, and should be approved.

## VIII.   LEAD COUNSEL'S REQUEST FOR FEES AND EXPENSES IS FAIR AND REASONABLE

Lead Counsel, having achieved recovery of $24.4 million in what appears to be a case worth substantially less, seek reimbursement of expenses in the amount of $1,910,420.76, plus an award of attorneys' fees in the amount of 30% of the *remaining* balance of the Settlement Fund *after* reimbursement of these expenses and payment of any PSLRA awards to the Class Representatives; *i.e.*, Lead Counsel seek a fee award that is 30% of the Settlement Fund "net" of expenses and awards to the Class Representatives. On the more traditional "gross" basis, this would amount to an award of only approximately 27.5%. In dollar terms this amount — approximately $6,715,374, plus a *pro rata* share of the accrued interest — is less than 32% of Lead Counsel's approximately $21,000,000 of lodestar in this case.

The $24.4 million Settlement obtained for the benefit of the Class is the result of literally tens of thousands of hours spent by Lead Counsel and the skill and perseverance of Lead

Counsel in litigating this Action. It represents a remarkable result for the Class in a complex case that posed a great many obstacles to recovery. Lead Counsel's considerable expenditure of time and resources on a difficult and protracted case, where Lead Counsel ultimately obtained a superior result in light of the size of the Class and the amount of recoverable damages, justifies the requested fee.

Lead Counsel devoted over 45,500 hours to the prosecution of this case over more than eight years. Lead Counsel prosecuted the Action on an entirely contingent-fee basis. The significant outlay of cash and personnel resources by Lead Counsel has been completely at risk. Given the uncertainties inherent in securities class actions generally and the difficulties in this particular case, there was a significant possibility that Lead Counsel would recover nothing for their substantial efforts. They are in any event recovering only a portion of their outlay.

Courts in this District and throughout the nation, recognizing the risks and effort generally expended by counsel to obtain favorable results, have not hesitated to award 30% of the "gross" recovery, or more, in complicated securities fraud cases such as this. Furthermore, the Settlement amount here far exceeds the national medians — in straight dollar terms and as a percentage of the recovery compared to the total alleged damages — for class action securities settlements after the passage of the PSLRA.

The reaction of the Class (or, rather, the lack of reaction of the Class) to the proposed fee award supports Lead Counsel's request. The support of the Class is not surprising, for even after payment of expenses of $1,910,420.76, PSLRA awards to Loftin of $100,000 and to Coughlin of $5,000, and Lead Counsel's requested fee of 30% of the remainder, the net payment to the Class — approximately $15,669,205, plus interest — still would be more than 100% of a $14.2 million damage figure.

39

A.    **Lead Counsel Are Awarded Fees from the Common Fund Created as**
      **a Result of the Settlement**

Courts have long recognized that "'attorneys who create a common fund to be shared by

a class are entitled to an award of fees and expenses from that fund as compensation for their

work.'" Veeco I, 2007 WL 4115809, at *2 (quoting American Bank Note, 127 F. Supp. 2d at

430); see Boeing Co. v. Van Gemert, 444 U.S. 472 (1980).  The purpose of the common fund

doctrine is to fairly and adequately compensate class counsel for services rendered and to prevent

the unjust enrichment of persons who benefit from a lawsuit without shouldering its costs.  Mills

v. Electric Auto-Lite Co, 396 U.S. 375, 392 (1970).  Moreover, awards of attorneys' fees from a

common fund "serve to encourage skilled counsel to represent those who seek redress for

damages inflicted on entire classes of persons, and to discourage future misconduct of a similar

nature." In re Telik, 576 F. Supp. 2d at 585.  Accordingly, Lead Counsel are entitled to an award

of attorneys' fees and expenses from the Settlement Fund.

Courts traditionally have used two methods to calculate attorneys' fees in common fund

cases:  the percentage method, which awards attorneys' fees as a percentage of the common fund

created for the benefit of the class; and the lodestar/multiplier or "presumptively reasonable fee"

approach, which multiplies the number of hours expended by counsel by the hourly rate

normally charged for similar work by attorneys of comparable skill and experience, and

enhances the resulting lodestar figure by an appropriate multiplier to reflect litigation risk, the

complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and

other factors. Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999).  The Second Circuit

has held that both the percentage and lodestar/multiplier methods are available to district courts

in awarding attorneys' fees in common fund cases.  Goldberger v. Integrated Res., Inc., 209 F.3d

43, 50 (2d Cir. 2000).  However, as has often and emphatically been noted, the percentage of

40

recovery methodology is considered the "most efficient and logical means" for calculating

attorneys' fees. In re Telik, 576 F. Supp. 2d at 584.

Under either method — percentage or lodestar/multiplier — the fees awarded in common

fund cases must be "reasonable" under the circumstances. Goldberger, 209 F.3d at 47; In re Fine

Host Corp. Sec. Litig., No. MDL 1241, 3:97-CV-2619 JCH, 2000 WL 33116538, at *4 (D. Conn.

Nov. 8, 2000). The Second Circuit has instructed that, in the exercise of their discretion,

> [D]istrict courts should continue to be guided by the traditional criteria in
> determining a reasonable common fund fee, including: "(1) the time and labor
> expended by counsel; (2) the magnitude and complexities of the litigation; (3) the
> risk of the litigation. . . . (4) the quality of representation; (5) the requested fee in
> relation to the settlement; and (6) public policy considerations."

Goldberger, 209 F.3d at 50 (quoting In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,

724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

The fee requested in this case — 30% of the "net" Settlement Fund (approximately

27.5% of the "gross" Settlement Fund) is reasonable in light of the extensive efforts and risks

faced over the course of nearly eight years of litigation and is well within the range of fees

awarded (even on "gross" settlements) by courts in this Circuit. See, e.g., In re Bisys Sec. Litig.,

No. 04 Civ. 3840(JSR), 2007 WL 2049726, at * 2 (S.D.N.Y. July 16, 2007) (30% of $65.87

million settlement); In re Priceline.com, Inc Sec. Litig., No. 3:00-CV-1884(AVC), 2007 WL

2115592, at *4-5 (D. Conn. 2007) (30% of $80 million settlement); Hicks v. Stanley, No. 01 Civ.

10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (30% of $10 million

settlement); In re Warnaco Group. Inc. Sec. Litig., No. 00 Civ. 6266(LMM), 2004 WL 1574690,

at *3 (S.D.N.Y. July 13, 2004) (30% of $12.85 million settlement); Kurzweil v. Phillip Morris

Co., Inc., Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105, at *1 (S.D.N.Y.

Nov. 30, 1999) (30% of $123 million settlement).

Indeed, as this Court wrote in In re Veeco Instruments ("Veeco II"), there are numerous

other common fund cases in this District alone where fees were awarded in the amount of 33

1/3% of the gross settlement fund.  Veeco Instruments Inc. Sec. Litig., No. 05 MDL 01695(CM),

2007 WL 4115808, at *4 n.5 (S.D.N.Y. Nov. 7, 2007) ("Veeco II") (collecting cases).[19]

Likewise, courts in other circuits around the country commonly award attorneys' fees

equal to or higher than the compensation requested here.  "Awards of 30% or more of a

settlement fund are not uncommon in § 10(b) common fund cases such as this."  Ressler v.

Jacobson, 149 F.R.D. 651, 655 (M.D. Fla. 1992); see also In re Rite Aid Corp. Sec. Litig., 146 F.

Supp. 2d 706, 735 (E.D. Pa. 2001) (noting that in a study of 287 settlements ranging from less

than $1 million to $50 million, "the median turns out to be one-third").  As this Court observed

in In re Telik (awarding attorneys' fees of 25% of the settlement amount):

> The requested fee is also less than the fee awards in many cases such as this
> throughout the rest of the country.  See, e.g., In re Ravisent Techs., Inc. Sec.
> Litig., 2005 WL 906361, at *15 (E.D. Pa. Apr.18, 2005) (awarding attorneys' fees
> of one-third of $7 million settlement); In re Corel Corp. Inc. Sec. Litig., 293 F.
> Supp. 2d 484, 497 (E.D. Pa. 2003) ("[T]he 33 1/3% fee request in this complex
> case is within the reasonable range."); Faircloth v. Certified Fin. Inc., 2001 WL
> 527489, at *12 (E.D. La. May 16, 2001) (awarding attorneys' fees of 35% of
> settlement plus interest and reimbursement of expenses).

In re Telik, 576 F. Supp. 2d at 587 (additional citations omitted).[20]

The Second Circuit "encourages" an analysis of counsel's lodestar "as a 'cross check' on

the reasonableness of the requested percentage."  Goldberger, 209 F.3d at 50; EVCI, 2007 WL

---

[19] See also In re Blech Sec. Litig., 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (33.3%);
In re APAC Teleservice, Inc. Sec. Litig., 1999 WL 1052004, at *1 (S.D.N.Y. Nov. 19, 1999) (33
1/3% of $21 million settlement); Becher v. Long Island Lighting Co., 64 F. Supp. 2d 174, 182
(E.D.N.Y. 1999) (one-third fee, plus expenses, is "well within the range accepted by courts in
this circuit"); In re Medical X-Ray Film Antitrust Litig., 1998 WL 661515, at *2 (E.D.N.Y. Aug.
7, 1998) (awarding 33 1/3% of $39.36 million after concluding such an award is "well within the
range accepted by courts in this circuit").

[20] See also In re Managed Care Litig., 2003 WL 22850070, at *2 (S.D. Fla. Oct. 24, 2003)
(awarding 35.5%).

2230177, at *17. Where the lodestar is used as a cross-check, "the hours documented by counsel
need not be exhaustively scrutinized by the district court." Goldberger, 209 F.3d at 50.

A lodestar analysis begins with the calculation of the lodestar, which is "comprised of the
amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate
of counsel." In re Prudential Sec. Inc. Ltd. Pshps,. Litig., 985 F. Supp. 410, 414 (S.D.N.Y.
1997). Here, Lead Counsel devoted over 45,500 hours to this matter and their lodestar was
$20,955,697.50. (Milberg Decl., ¶ 6 and Exh. A.)[21] Lead Counsel's efforts are described in
detail *supra*, and in the accompanying Friedman Declaration. Lead Counsel is also overseeing
all aspects of the settlement process, a responsibility that will continue into the coming months.

Lead Counsel are highly experienced in prosecuting complex securities class action
cases. (Milberg Decl., Exh. D.) Consequently, Lead Counsel "were presumably able to perform
the various tasks necessary to advance Plaintiffs' and the Class's interests in a more efficient
manner than would have counsel with a lesser degree of specialization in the field." In re Telik,
576 F. Supp. 2d at 588-89 (citing Teachers Ret. Sys. of La. v. A.C.L.N., Ltd., No. 01-CV-
11814(MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) (noting that the skill and prior
experience of counsel in the specialized field of shareholder securities litigation is relevant in
determining fair compensation)).

Finally, in evaluating the reasonableness of the hours expended on this case, it is critical
to note that until the Second Circuit decision on July 22, 2009 — that is, for more than seven

---

[21] In addition, Finkelstein Thompson devoted 46.9 hours to this matter on a fully contingent
basis, and their lodestar was $17,590.00, in connection with Lead Counsels' efforts to compel the
production of documents from Gibson, Dunn & Crutcher. (Finkelstein Decl. ¶¶ 2, 5 and Exh. 1.)
All other law firms that assisted Lead Counsel were foreign firms that may not legally be paid
contingently, or, in one instance, an American bankruptcy firm that would not work
contingently, and so these fees and expenses were advanced by Lead Counsel and are being
treated by Lead Counsel as an expense to Lead Counsel. (Milberg Decl., Exhs. B and C.)

years of the pendency of this case — the estimated amount of damages available to the Class was between \$362 million and \$465.5 million.

In a lodestar analysis, the appropriate hourly rates are "'those [rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience and reputation.'" Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting Blum v. Stenson, 465 U.S. 886 (1984)); see also Luciano v. Olsten Corp., 109 F.3d 111, 115-16 (2d Cir. 1997); Veeco II, 2007 WL 4115808, at \*9. In complex securities class actions in this Circuit and around the country, courts have repeatedly found rates similar to those charged by Lead Counsel here to be reasonable; indeed, the American Lawyer recently reported that the *median* billing rate for partners at many leading law firms exceeds \$900/hour.[22] The median rates for the firms representing defendants in this case were reported to be \$950/hour for Shearman & Sterling and \$900/hour for Milbank, Tweed, Hadley & McCloy. And, of course, we know that counsel for the Individual Defendants, Shearman & Sterling, who were paid currently and on a risk-free basis, long ago exhausted the entirety of a \$20 million primary layer of insurance on defense costs.

"Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144(CM), 2009 WL 5178546, at \*20 (S.D.N.Y. Dec. 23, 2009) (citing Goldberger, 209 F.3d at 47); Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999). "In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court." In re Telik, 576 F. Supp. 2d at 590 (a multiplier of 4.65 was "well within the range

---

[22] *Bankruptcy Billing*, The American Lawyer, February 2010, at 44-45.

awarded by courts in this Circuit and courts throughout the country") (citing Maley, 186 F.
Supp.2d at 369). In this case, the percentage fee requested represents a fractional multiplier of
less than 0.32 times the lodestar. Thus, even though Lead Counsel here assumed very substantial
risk in prosecuting this case and achieved an excellent result considering all the circumstances,
they will nevertheless recoup far less than their lodestar.

     Lead Counsel's request for a percentage fee representing a significant discount from their
lodestar provides additional support for the reasonableness of the fee request. See In re Initial
Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (awarding fees of 33 1/3%,
noting that even in a mega-fund case, there is "no real danger of overcompensation" where the
award represents a fractional multiplier to the lodestar); Veeco II, 2007 WL 4115808, at *10
("Not only is Plaintiffs' Counsel not receiving a premium on their lodestar to compensate them
for the contingent risk factor, their fee request amounts to a deep discount from their lodestar.
Thus, the lodestar 'cross-check' unquestionably supports a percentage fee award of 30%."); In re
Blech Sec. Litig., Nos. 94 CIV. 7696(RWS), 95 CIV. 6422(RWS), 2000 WL 661680, at *5
(S.D.N.Y. May 19, 2000) (awarding lead counsel 30% of the settlement, and confirming that the
award was reasonable because it represented a fractional multiplier of lead counsel's lodestar).

     Finally, the Second Circuit has stated that whether the Court uses the percentage method
or the lodestar approach, it should continue to consider the following traditional criteria: (1) the
time and labor expended by counsel; (2) the risks of the litigation; (3) the magnitude and
complexity of the litigation; (4) the requested fee in relation to the settlement; (5) the quality of
representation; and (6) public policy considerations. Goldberger, 209 F.3d at 50. An analysis of
these factors demonstrates that the requested fee is reasonable.

     Lead Counsel has devoted over 45,500 hours to the prosecution and settlement of this

45

case. (Milberg Decl., ¶ 6 and Exh. A.)  As detailed *supra* and in the accompanying Friedman Declaration, these efforts were reasonable and necessary to the effective prosecution of this Action.

The reasonableness of the requested fee is also supported by an evaluation of the risks undertaken by Lead Counsel in prosecuting this Action.  The Second Circuit has recognized that "despite the most vigorous and competent of efforts, success is never guaranteed."  Grinnell, 495 F.2d at 471.  Securities class actions such as this are "notably difficult and notoriously uncertain."  In re Sumitomo, 189 F.R.D. at 281.

Lead Counsel undertook this Action on a wholly contingent basis, investing substantial amounts of time and money to prosecute this litigation with no guarantee of compensation or even the recovery of out-of-pocket expenses.  Unlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began more than eight years ago. Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award.  See, e.g., American Bank Note, 127 F. Supp. 2d at 433 (concluding it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"); In re Prudential, 985 F. Supp. 2d at 417 ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

Lead Counsel prosecuted this action essentially by itself against teams of defense lawyers from two large and well-funded firms — Shearman & Sterling and Milbank, Tweed, Hadley & McCloy — plus other substantial defense firms who represented earlier defendants (*e.g.*, Kirkland & Ellis on behalf of Verizon) and/or who appeared in connection with discovery

disputes (*e.g.*, Gibson Dunn, appearing *pro se*).

Moreover, there was no prior governmental action against FLAG on which Lead Counsel could "piggy back." The burden and the risk here were borne solely by Lead Counsel. As this Court wrote in Veeco II:

> Indeed, the risk of non-payment in complex cases, such as this one, is very real. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. There is no guarantee of reaching trial, and even a victory at trial does not guarantee recovery. As the Court stated in Warner: "Even a victory at trial is not a guarantee of ultimate success. . . . An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." 618 F. Supp. at 747-48.

2007 WL 4115808, at *6 (quoting In re Warner Commc'n Sec. Litig., 618 F. Supp. 735, 747-48 (S.D.N.Y. 1985)).

The risks involved in this case were compounded by the complexity of the issues. Lead Counsel faced enormous obstacles in proving the liability of the Defendants. Assuming these hurdles could be overcome, Lead Counsel still faced the burden of proving both the extent of the Class's damages and that those damages were caused by Defendants' conduct, a "complicated and uncertain" process at best. Global Crossing, 225 F.R.D. at 459. Moreover, the risk of this case for Lead Counsel increased as a result of developments in the law during the course of this litigation, especially in the areas of loss causation and class certification.

Much of the risk borne by Lead Counsel here was realized when the Second Circuit held that in-and-out traders should be excluded from the Class, because there was no loss causation prior to the end of the Class Period (thus also arguably limiting the remaining Class's damages). As a result of this decision, the maximum potential damages available to the Class arguably were reduced from more than $362 million to potentially as little as $14.2 million.

Notwithstanding the foregoing significant risks of continued litigation, Lead Counsel

zealously represented the Class and secured for them a sizable recovery — indeed, a recovery greater than what may have been the maximum potential recoverable damages. The risks associated with this litigation clearly support the reasonableness of Lead Counsel's fee request.

As discussed above, the proposed fee — 30% of the "net" Settlement amount — is well within the range of fees awarded by courts in this Circuit and other circuits in securities class actions. Thus, this factor weighs in favor of the reasonableness of the requested fee.

The quality of the representation and the standing of Lead Counsel are important factors that also support the reasonableness of the requested fee. Lead Counsel have immense experience in complex federal civil litigation, particularly the litigation of securities and other class actions and have received significant recognition for their work. Lead Counsel's experience allowed them to identify the complex issues involved in this case and formulate appropriate and effective litigation strategies. Lead Counsel aggressively prosecuted this Action for roughly eight years and ultimately obtained an extraordinary recovery for the Class.

The skill and sophistication of Lead Counsel's representation in this case enabled Plaintiffs to prevail in battle after battle, critical motion after critical motion, including, most notably, the motions to dismiss, the motion for judgment on the pleadings, countless discovery motions, the motion for class certification (in which Plaintiffs also won every issue on appeal other than loss causation), and the partial summary judgment motion. But nowhere was the skill of Lead Counsel more dramatically displayed than in the mediation and negotiation with the *Rahl* Trustee and the subsequent mediation with the Defendants, which led to the Plaintiffs obtaining FLAG's privileged documents from FTGL, and ultimately to the Plaintiffs receiving 70% of the total recovery from the Individual Defendants in both cases.

Furthermore, the Settlement was obtained in the face of extremely aggressive opposition

from the Defendants, represented by the pre-eminent defense firms of Shearman & Sterling and Milbank, Tweed, Hadley & McCloy. The quality of the opposition should be taken into consideration in assessing the quality of Lead Counsel's performance. See, e.g., Teachers Ret. Sys., 2004 WL 1087261, at *20; Maley., 186 F. Supp. 2d at 373.

Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." In re Merrill Lynch Tyco, 249 F.R.D. 124, 141-42 (S.D.N.Y. 2008) ("'In order to attract well qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.'") (quoting In re Worldcom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005)). Moreover, "public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the *SEC*." In re Bristol-Myers, 361 F. Supp. 2d 229, 236 (S.D.N.Y. 2005); see also Maley, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); In re Visa Check/Master Money Antitrust Litig., 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future."), aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96 (2d Cir. 2005).

If this important public policy is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook. In this case, Lead Counsel seeks a fee that is significantly less than its accrued lodestar. As such, public policy considerations favor granting the fee request.

Finally, numerous courts have noted that the lack of objection from members of the class

is one of the most important factors in determining the reasonableness of a requested fee. Maley, 186 F. Supp. 2d at 374 ("The reaction by members of the Class is entitled to great weight by the Court."); Ressler, 149 F.R.D. at 656 (lack of objections is "strong evidence" of the reasonableness of the fee request); In re Prudential Sec. Inc. Ltd. P'ships Litig., 912 F. Supp. 97, 103 (S.D.N.Y. 1996) (court determined that an "isolated expression of opinion" should be considered "in the context of thousands of class members who have not expressed themselves similarly"), aff'd, Toland v. Prudential Sec. P'ship Litig., 107 F.3d 3 (2d Cir. 1996).

Over 43,450 Notices have been mailed to potential Class Members and a Summary Notice was also published in *The Wall Street Journal*. (Fishbein Aff., ¶ 8; Andrejkovics Aff., ¶ 2.) The Notice mailed to Class Members stated that Lead Counsel would seek reimbursement of expenses in the approximate amount of $2 million, plus an award of attorneys' fees in the amount of 30% of the remaining balance of the Gross Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs. Notably, not one Class Member has objected to this request. The overwhelmingly positive response to date by the Class attests to the approval of the Class with respect to both the Settlement and the fee and expense application.

## IX. THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE AND APPROPRIATE

It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class. See, e.g., Teachers' Ret. Sys., 2004 WL 1087261, at *6; American Bank Note, 127 F. Supp. 2d at 430. "'Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.'" *EVCI*, 2007 WL 2230177, at *18 (quoting In re McDonnell Douglas Equip. Lease Fee Litig., 842 F. Supp. 733, 746 (S.D.N.Y. 1994)). Courts have awarded such expenses so long as counsel's

documentation of them is "adequate." NASDAQ Market-Makers, 187 F.R.D. at 489.

In the Milberg and Finkelstein Declarations, counsel have detailed and documented the $1,910,420.76 in expenses that they incurred in connection with this action.[23] These expenses are of the type that law firms typically bill to their clients, including photocopying of documents, mediation fees, court filing fees, deposition transcripts, fees for foreign counsel, on-line research, creation of a document database, messenger service, postage and next day delivery, long distance and facsimile expenses, transportation, travel, and other expenses directly related to the prosecution of this Action. All of these expenses are customary and necessary expenses for a complex securities action, and were necessary for Lead Counsel to successfully prosecute this case.

In addition, Lead Counsel retained accounting, damages and other experts. These experts assisted Lead Counsel in the factual investigation and analysis in connection with the amended complaints and during merits discovery, and also assisted Lead Counsel in preparing their submissions for mediation and a potential trial. This Court and others have reimbursed such expert witness fees where "[t]he expenses incurred were essential to the successful prosecution and resolution of [the] Action." Veeco II, 2007 WL 4115808, at *11 (quoting EVCI, 2007 WL 2230177, at *18.)

Finally, the expenses for which reimbursement is sought amount to less than the expense figure of $2 million referred to in the Notice, to which no objection was filed.

Accordingly, Lead Counsel's request for reimbursement of these expenses is granted.

---

[23] Of the total expenses set forth in text, only a relatively small amount — $1,165.83 — were incurred by Finkelstein Thompson.

## X. LEAD PLAINTIFFS ARE ENTITLED TO AN AWARD PURSUANT TO 15 U.S.C. § 78U-4(A)(4)

Under the PSLRA, the Court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4). See also Hicks, 2005 WL 2757792, at *10. Lead Plaintiffs devoted substantial amounts of their time to the oversight of, and participation in, the litigation on behalf of the Class. (See Loftin Declaration at ¶¶ 6-17; Coughlin Declaration at ¶¶ 5-9.)

As Judge Conner wrote in his decision granting class certification, the Lead Plaintiffs "all received and reviewed the pleadings, consulted with [Lead Counsel] on various issues relevant to the lawsuit, produced documents and participated in depositions. Loftin, for example, is intimately familiar with the claims and was uniquely involved in the drafting of the Complaint, particularly with respect to the decision to initially name Verizon as a defendant. . . . And Coughlin, during his deposition, cogently explained the underlying basis for the litigation."[24]

The Settlement Notice advised Class Members that application "will also be made for reimbursement to the Lead Plaintiffs for an amount not to exceed $100,000 for Lead Plaintiff Peter T. Loftin and for an amount not to exceed $5,000 for Lead Plaintiff Joseph Coughlin."[25]

No objections to these requests have been filed. They are granted.

Mr. Loftin, who lost over $24 million in FLAG stock, has been actively involved in this litigation since its inception in 2002.[26] As set forth in the Loftin Declaration, he reviewed and

---

[24] In re Flag Telecom, 245 F.R.D. at 160-63.

[25] Settlement Notice, at 2.

[26] Mr. Loftin founded and was, for many years, the Chairman and CEO of a domestic long distance phone company named BTI. Today he owns Casa Casuarina, an upscale South Beach,

52

authorized the various complaints, as well as countless other pleadings, and, incredibly, even assisted in researching and drafting significant parts of the complaint. He consulted regularly with counsel, and insisted on Lead Counsel visiting him at his home in Florida for a full-day in-person briefing. He also traveled from Miami to New York for his deposition, which lasted a full day, as well as a preparation session the day before. He also produced over 4,000 pages of documents from his and his business's files. And, of course, he also sent his in-house counsel to attend several of the mediation sessions in person. In total, Mr. Loftin estimates that he has spent more than four hundred hours on this litigation over the eight years it has been pending. (Loftin Decl., ¶ 17.)

Mr. Coughlin responded to Lead Counsel's statutory lead plaintiff notice at the beginning of the case, but because his loss was much smaller than Mr. Loftin's, he did not seek to intervene as an additional Lead Plaintiff and Class Representative until February 2005, in response to threats from the Defendants that they would challenge Mr. Loftin as a Class Representative in light of his prior work for BTI.[27]  Because he became involved significantly later in the case, Mr. Coughlin spent much less time on this matter than did Mr. Loftin, but he still spent a meaningful amount of time.

---

Florida hotel and event location in the former Versace Mansion. Over the course of the Class Period, especially the summer of 2000, he purchased a total of 1,700,000 FLAG shares at various prices, primarily in the range of $15.50 per share. He sold 297,300 of these shares in early April 2001, at prices ranging from approximately $2.72 to $4.02 per share, and held the remainder until FLAG filed for bankruptcy.

[27] Mr. Coughlin served in the Air Force from 1958 to 1962, and then spent six years with the CIA in cryptographic communications, at times posted overseas in classified locations; both positions required a security clearance. He then spent six years as a facilities analyst at IBM. Prior to retiring he spent 20 years as a court reporter. Mr. Coughlin purchased 250 shares traceable to the IPO at prices just under $31.25 per share on February 23, 2000, and purchased an additional 100 shares on July 3, 2001 for $5.17 per share. He held these shares until FLAG filed for bankruptcy.

53

In addition to reviewing the complaint and other pleadings and communicating with Lead Counsel, Mr. Coughlin collected his documents for production to the Defendants, and travelled from Florida to New York to sit for a half-day deposition, and also spent time preparing for his deposition the night before. In total, Mr. Coughlin estimates that he has spent approximately twenty hours on this litigation, including travel time. Coughlin Decl., ¶ 9.

## XI. CONCLUSION

For the reasons set forth above, the Court grants the motion for an order granting: (1) final approval of the proposed Settlement; (2) final approval of the proposed Plan of Allocation for the settlement proceeds; (3) reimbursement of $1,910,420.76 for expenses incurred in connection with the prosecution and settlement of the Action and attorneys' fees in the amount of 30% of the remaining balance of the Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs; and (4) awards to Lead Plaintiffs for their services in prosecuting the Action in the amounts of $100,000 for Lead Plaintiff Peter T. Loftin and $5,000 for Lead Plaintiff Joseph Coughlin.

Dated: November 5, 2010

U.S.D.J.

BY ECF TO ALL COUNSEL

54